No. 23-13914
*(consolidated with Nos. 23-13916 & 23-13921)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

—————————————

ALPHA PHI ALPHA FRATERNITY, INC., et al.,

Plaintiffs-Appellees

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

—————————————

BRIEF FOR THE UNITED STATES AS APPELLEE

—————————————

RYAN K. BUCHANAN
 United States Attorney
 Northern District of Georgia

AILEEN BELL HUGHES
 Georgia Bar No. 375505
 Assistant U.S. Attorney
 Office of the United States Attorney
 600 U.S. Courthouse
 75 Ted Turner Drive, SW
 Atlanta, GA  30303
 (404) 581-6000

KRISTEN CLARKE
 Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 598-0243

No. 23-13916
*(consolidated with Nos. 23-13914 & 23-13921)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

COAKLEY PENDERGRASS, et al.,

Plaintiffs-Appellees

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

RYAN K. BUCHANAN
 United States Attorney
 Northern District of Georgia

AILEEN BELL HUGHES
 Georgia Bar No. 375505
 Assistant U.S. Attorney
 Office of the United States Attorney
 600 U.S. Courthouse
 75 Ted Turner Drive, SW
 Atlanta, GA  30303
 (404) 581-6000

KRISTEN CLARKE
 Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 598-0243

No. 23-13921
*(consolidated with Nos. 23-13914 & 23-13916)*

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

ANNIE LOIS GRANT, et al.,

Plaintiffs-Appellees

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA 30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 598-0243

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Ga.*, No. 23-13914
*(consolidated with Nos. 23-13916 & 23-13921)*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 to 26.1-3 and 28-1(b), counsel for appellee United States hereby certifies that in addition to those identified in the brief filed by appellants, the following individuals have an interest in the outcome of this case:

1.    Clarke, Kristen, U.S. Department of Justice, Civil Rights Division, counsel for United States;

2.    Buchanan, Ryan K., U.S. Attorney's Office, Northern District of Georgia, counsel for United States;

3.    Hughes, Aileen Bell, U.S. Attorney's Office, Northern District of Georgia, counsel for United States.

s/ Noah B. Bokat-Lindell
Noah B. Bokat-Lindell
  Attorney

Date:  April 8, 2024

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose appellant's request for oral argument and agrees that oral argument could assist the Court in its resolution of the issues on appeal.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND COPRPORATE
DISCLOSURE STATEMENT

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF THE ISSUES ................................................................1

STATEMENT OF THE CASE.................................................................1

    A.    Statutory Background...........................................................1

    B.    Factual Background..............................................................5

SUMMARY OF ARGUMENT..................................................................7

ARGUMENT

    I.    Plaintiffs do not need to prove racial animus to establish
        a Section 2 vote-dilution claim.............................................9

        A.    Courts may consider evidence of partisan voting
            preferences only as part of Section 2's totality
            analysis..................................................................9

        B.    Evidence that racially polarized voting patterns are
            correlated with partisan preferences does not
            defeat a Section 2 vote-dilution claim. ....................14

    II.    Neither the passage of time nor the Secretary's claims about
        conditions in Georgia renders Section 2 unconstitutional. ...........20

        A.    *Milligan* forecloses any claim that Section 2's results
            test or racially conscious remedies exceed Congress's
            Fifteenth Amendment authority. ...............................20

**TABLE OF CONTENTS (continued):**                                    **PAGE**

B.    Section 2's liability and remedial regime remains a rational means of enforcing the Fifteenth Amendment. ...........22

    1.    The Secretary waived his temporal claim. .....................22

    2.    Congress does not need to continuously renew Section 2 for the statute to be constitutional. .................25

        a.    Congress need not continuously update Reconstruction Amendment laws and their supporting evidence to anticipate new lawsuits. ...............................................................26

        b.    *Shelby County* does not alter Congress's duties with respect to Section 2. ...........................31

        c.    A continuous "updating" requirement would unduly burden Congress and undermine the rule of law. .....................................34

C.    The Secretary's disagreement with the district court's ruling does not render Section 2 unconstitutional. ...................36

III.    Both the VRA and 42 U.S.C. 1983 provide private plaintiffs a right of action to sue under Section 2. ....................................39

A.    Section 2 creates personal rights. ...............................................41

B.    Congress provided a private remedy to enforce Section 2. ...................................................................................42

    1.    The VRA's text evinces Congress's intent to provide a private right of action to enforce Section 2. ........................................................................43

    2.    Supreme Court and lower-court precedent alike confirm that the VRA creates a private remedy for Section 2 violations. ......................................48

**TABLE OF CONTENTS (continued):**                                    **PAGE**

3.    The Eighth Circuit's outlier decision is
unpersuasive. ...................................................................51

C.    Private plaintiffs can enforce Section 2 via
42 U.S.C. 1983.............................................................53

CONCLUSION ...........................................................................................55

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:**                                                    **PAGE**

*Alabama v. PCI Gaming Auth.*, 801 F.3d 1278 (11th Cir. 2015) ...........................44

*Alabama State Conf. of NAACP v. Alabama*,
    949 F.3d 647, 651-652 (11th Cir. 2020),
    *cert. granted, judgment vacated as moot*,
    141 S. Ct. 2618 (2021) ........................................................... 40, 44-45, 49, 53

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...........................................................43

*Allen v. Milligan*,
    599 U.S. 1 (2023) .......... 4-5, 8, 10, 14-15, 18-19, 21-22, 26-27, 30, 33-39, 49

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) .................... 43-44, 46, 48, 54

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023), *reh'g en banc denied*,
    91 F.4th 967 (8th Cir. 2024) ................................................................... 51-53

*Association for Disabled Ams., Inc. v. Florida Int'l Univ.*,
    405 F.3d 954 (11th Cir. 2005) .....................................................................34

*Blessing v. Freestone*, 520 U.S. 329 (1997) ...........................................................41

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ................................................. 45-46

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) .................... 2, 30-31

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) ..........................................43

*Chisom v. Roemer*, 501 U.S. 380 (1991) ............................................................2, 42

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................. 26-30

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ...................................................... 1-2

*City of Rome v. United States*, 446 U.S. 156 (1980) ..............................................22

**CASES (continued):** **PAGE**

*Clark v. Calhoun Cnty.*, 88 F.3d 1393 (5th Cir. 1996) ............................................14

*Clark v. Martinez*, 543 U.S. 371 (2005) ..................................................23

*Clarke v. City of Cincinnati*, 40 F.3d 807 (6th Cir. 1994) ......................................13

*Clerveaux v. East Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) .............13

*Colón-Marrero v. Vélez*, 813 F.3d 1 (1st Cir. 2016) ................................................40

*Cottier v. City of Martin*, 445 F.3d 1113 (8th Cir. 2006),
    *vacated on reh'g en banc*, 604 F.3d 553 (8th Cir. 2010) ..............................13

*Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212 (11th Cir. 2010) ..........................24

*EEOC v. Eberspaecher N. Am. Inc.*, 67 F.4th 1124 (11th Cir. 2023) ....................22

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ..................................55

*Ford v. Strange*, 580 F. App'x 701 (11th Cir. 2014) ................................................48

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) ............................................50

*Georgia State Conf. NAACP v. Georgia*, No. 1:21-cv-5338,
    2022 WL 18780945 (N.D. Ga. Sept. 26, 2022) (per curiam)................. 42, 49

*Georgia State Conf. NAACP v. Georgia*, No. 1:21-cv-5338,
    2023 WL 7093025 (N.D. Ga. Oct. 26, 2023) ................................................13

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ................................................ 40-42, 54

*Goosby v. Town Bd. of Hempstead*, 180 F.3d 476 (2d Cir. 1999) .................... 13, 16

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
    599 U.S. 166 (2023)........................................................................ 41-42, 54

*Henderson v. McMurray*, 987 F.3d 997 (11th Cir. 2021)........................................52

**CASES (continued):** **PAGE**

*Hundertmark v. State of Florida Dep't of Transp.*,
  205 F.3d 1272 (11th Cir. 2000) ..................................................29

*In re Employment Discrimination Litig. Against State of Ala.*,
  198 F.3d 1305 (11th Cir. 1999) ....................................... 28, 30, 34

*In re Wild*, 994 F.3d 1244 (11th Cir. 2021) (en banc) ...........................42-43, 47-48

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ...........................................39

*Johnson v. Hamrick*, 196 F.3d 1216 (11th Cir. 1999) ..............................21

*League of United Latin Am. Citizens v. Clements*,
  999 F.2d 831 (5th Cir. 1993) (en banc) .................................. 13, 16

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) .....................39

*Lewis v. Governor of Alabama*, 896 F.3d 1282 (11th Cir. 2018),
  *vacated for rehearing en banc*,
  914 F.3d 1291 (11th Cir.) (en banc),
  *on rehearing en banc*, 944 F.3d 1287 (11th Cir. 2019) (en banc) .... 40-41, 49

*Lopez v. Monterey Cnty.*, 525 U.S. 266 (1999) ......................................27

*Marks v. United States*, 430 U.S. 188 (1977) ..........................................51

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) .......................................26

*McGuire v. Marshall*, 50 F.4th 986 (11th Cir. 2022) ...............................38

*Milwaukee Branch of the NAACP v. Thompson*,
  116 F.3d 1194 (7th Cir. 1997) ...................................................13

*Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984)................21

*Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999) .........................................49

*\*Morse v. Republican Party of Va.*, 517 U.S. 186 (1996)...............45, 47-49, 51-52

**CASES (continued):** **PAGE**

*Nairne v. Ardoin*, No. 3:22-cv-178,
  2024 WL 492688 (M.D. La. Feb. 8, 2024)....................................................23

*National Ass'n of the Deaf v. Florida*, 980 F.3d 763 (11th Cir. 2020) ...... 28, 30, 34

*Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003) ....................................34

*Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400 (1968) (per curiam)..............47

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc) ............................ 13, 15

*Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009)..........26

*Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) ............................................ 44, 49

*Sanchez v. Colorado*, 97 F.3d 1303 (10th Cir. 1996)....................................... 13, 16

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) .............................................. 40, 55

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ...................................1, 22, 26, 31-33

*Singleton v. Merrill*, No. 2:21-cv-1530,
  2022 WL 265001 (N.D. Ala. Jan. 24, 2022) .................................................49

*Solomon v. Liberty Cnty. Comm'rs*,
  221 F.3d 1218 (11th Cir. 2000) (en banc) ............................................. 13, 15

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .............................................27

*Students for Fair Admissions, Inc. v. President &
  Fellows of Harvard Coll.*, 600 U.S. 181 (2023).................................... 24, 34

*Teague v. Attala Cnty.*, 92 F.3d 283 (5th Cir. 1996) ...............................................14

*Tennessee v. Lane*, 541 U.S. 509 (2004) ................................................27-28, 34-35

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015)..........................................................................................34

**CASES (continued):**                                             **PAGE**

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ................... 2-3, 9, 11-12, 15-16, 29, 50

*Trump v. Anderson*, 144 S. Ct. 662 (2024) (per curiam) ........................................27

*United States v. Blaine Cnty.*, 363 F.3d 897 (9th Cir. 2004) ..................... 13, 20, 32

*United States v. Campbell*, 26 F.4th 860, 872 (11th Cir.) (en banc),
    *cert. denied*, 143 S. Ct. 95 (2022)................................................................25

*United States v. Charleston Cnty.*, 365 F.3d 341 (4th Cir. 2004).................... 13, 16

*United States v. Diggins*, 36 F.4th 302 (1st Cir.), *cert. denied*,
    143 S. Ct. 383 (2022).......................................................................................32

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984)..... 14, 21

*United States v. Raines*, 362 U.S. 17 (1960).............................................................43

*United States v. Utsick*, 45 F.4th 1325 (11th Cir. 2022).........................................41

*Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995)..... 13, 15-16

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977).........................................................................................39

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023)................................................28

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ............................................................. 14-15

**CONSTITUTION:**

U.S. Const. Amend. XV.......................................................................................36

**STATUTES:**

Voting Rights Act of 1965
    52 U.S.C. 10301.........................................................................................1, 9

**STATUTES (continued):** **PAGE**

*52 U.S.C. 10301(a) ................................................................2, 42
*52 U.S.C. 10301(b) ........................... 2, 9, 18, 29, 38, 42
52 U.S.C. 10302.................................................... 44, 53
52 U.S.C. 10308(d) .............................................. 47, 54
52 U.S.C. 10308(e) .......................................................47
52 U.S.C. 10308(f) ........................................................46
52 U.S.C. 10310(e) ..............................................47, 53
Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965) ................................1
Pub. L. No. 91-285, 84 Stat. 314 (1970) ...........................50
Pub. L. No. 94-73, 89 Stat. 400 (1975) .............................50
Pub. L. No. 97-205, 96 Stat. 131 (1982) ...........................50
Pub. L. No. 109-246, 120 Stat. 577 (2006) ....................50

1 U.S.C. 1 ...........................................................................46

28 U.S.C. 2403(a) ...............................................................6

*42 U.S.C. 1983 ............................................ 9, 39-41, 45, 53

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 227, 97th Cong., 1st Sess. (1981) ........................ 46-47, 50

*S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ......... 3, 18, 20, 30, 39, 45-46, 48, 50

**MISCELLANEOUS:**

Ellen D. Katz et al., *To Participate and Elect: Section 2 of the Voting
    Rights Act at 40*, Univ. Mich. L. Sch. Voting Rights Initiative (2022),
    https://voting.law.umich.edu (last updated July 1, 2023)........................ 49-50

*Voting Section Litigation*, U.S. Dep't of Justice,
    https://perma.cc/V5XK-Z7L8 (last updated Jan. 17, 2024). ..........................50

## STATEMENT OF THE ISSUES

The United States addresses the following issues and takes no position on the ultimate merits of plaintiffs' Section 2 claims:

1.  Whether plaintiffs can prove a claim under Section 2 of the Voting Rights Act (VRA), 52 U.S.C. 10301, when minority-preferred candidates are unlikely to succeed in an environment of racially polarized voting that correlates with partisan preferences.

2.  Whether Section 2's results test is valid Fifteenth Amendment enforcement legislation.

3.  Whether the district court correctly held that private plaintiffs may enforce Section 2.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.  Section 2 of the VRA imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  The statute as originally enacted in 1965 prohibited voting practices or procedures that "deny or abridge the right of any citizen of the United States to vote on account of race or color."  Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965).  In *City of Mobile v. Bolden*, 446 U.S. 55 (1980), a plurality of the Supreme Court held that Section 2 "simply restated the prohibitions already contained in the Fifteenth Amendment"

and therefore reached only "purposefully discriminatory" government actions. *Id.* at 61, 65.

Congress amended Section 2 in 1982 to "repudiate" *Bolden*'s interpretation of the statute. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021). By its text, Section 2 now prohibits States from imposing or applying voting practices or procedures "in a manner which *results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. 10301(a) (emphasis added). That is, a plaintiff need not show discriminatory intent to establish a Section 2 violation. *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

A "results" violation is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in [a] State or political subdivision are not equally open to participation by members of a class of citizens protected by" Section 2, "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. 10301(b).

2. The Supreme Court first construed Section 2, as amended, in *Thornburg v. Gingles*, 478 U.S. 30 (1986). The Court explained that the "essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and

- 2 -

historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Id.* at 47.

*Gingles* concerned a claim that a districting scheme "dilutes the[] votes" of minorities by "submerging them in a white majority." 478 U.S. at 46. The Court identified three "necessary preconditions" for such a claim. *Id.* at 50. First, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Ibid.* Second, "the minority group must be able to show that it is politically cohesive." *Id.* at 51. Third, "the minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc" to allow it "usually to defeat the minority's preferred candidate." *Ibid.*

If those preconditions are satisfied, a court must determine whether, considering "the totality of the circumstances," the districting scheme leaves minority voters with "less opportunity than white voters to elect representatives of their choice." *Gingles*, 478 U.S. at 80. In conducting that analysis, courts may consider factors identified in the Senate Report accompanying the 1982 amendments, *see* S. Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982) (1982 Senate Report); *Gingles*, 478 U.S. at 44-45, but "other factors may also be relevant and may be considered," *Gingles*, 478 U.S. at 45.

3.  Last year, the Supreme Court reaffirmed the *Gingles* test and upheld Section 2's constitutionality.  *See Allen v. Milligan*, 599 U.S. 1 (2023).  In affirming a finding that Alabama's congressional map likely violated Section 2, *id.* at 17, the Court noted that "[e]ach *Gingles* precondition serves a different purpose," *id.* at 18.  While the first precondition is designed to show that a minority group has the *potential* to elect a representative of its choice in a single-member district, "[t]he second, concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected" in that district.  *Id.* at 18-19.  "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."  *Id.* at 19 (internal citation omitted; alteration in original).

Alabama urged the Supreme Court to require Section 2 plaintiffs to prove, either under the *Gingles* preconditions or as part of the totality-of-circumstances analysis, that a "race-neutral" districting process would have led to the same number of majority-minority districts the plaintiffs alleged were required. *Milligan*, 599 U.S. at 23-24.  But the Court "decline[d]" Alabama's invitation "to adopt an interpretation of § 2 that would 'revise and reformulate the *Gingles* threshold inquiry that has been the baseline of our § 2 jurisprudence' for nearly forty years."  *Id.* at 26 (citation omitted).  The Court also reaffirmed Section 2's

constitutionality, rejecting Alabama's arguments that Section 2 could not constitutionally apply to redistricting because the Fifteenth Amendment "does not authorize" either "the effects test" or "race-based redistricting as a remedy." *Id.* at 41.

### B.    Factual Background

Plaintiffs in these three cases sued Georgia Secretary of State Brad Raffensperger, challenging Georgia's 2021 congressional and state legislative maps as impermissibly diluting minority voting strength under Section 2 of the VRA. *See APA* Doc. 141, at 5-11, 26, 30; *Pendergrass* Doc. 120, at 1-8, 28-29; *Grant* Doc. 96, at 2-12, 34-36.[1]

All three cases proceeded before a single district judge. The district court first denied the Secretary's motions to dismiss, rejecting the Secretary's argument that private plaintiffs cannot enforce Section 2. *APA* Doc. 65, at 31-34; *Pendergrass* Doc. 50, at 17-21; *Grant* Doc. 43, at 30-33. The court later denied the parties' cross-motions for summary judgment, rejecting the Secretary's legal arguments in the process—including his arguments about how to establish racially

---

[1] "*APA* Doc. __, at __," "*Pendergrass* Doc. __, at __," and "*Grant* Doc. __, at __" refer to the docket entry and page number of documents filed in the district court in *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga.), *Pendergrass v. Raffensperger*, No. 1:21-cv-5339 (N.D. Ga.), and *Grant v. Raffensperger*, No. 1:22-cv-122 (N.D. Ga.), respectively. "Br. __" refers to page numbers in the Secretary's opening brief.

polarized voting under the *Gingles* preconditions. *E.g.*, *Pendergrass* Doc. 215, at 48-64, 109. The court held a coordinated trial from September 5 to 14, 2023. *APA* Docs. 299-308.

In a pretrial filing, as well as in his post-trial proposed findings of fact and conclusions of law, the Secretary argued that ruling for the plaintiffs "requires interpreting the Voting Rights Act in a way that calls its constitutionality into question." *APA* Doc. 280, at 22-23; *see APA* Doc. 317, at 173-174. The district court issued an order certifying to the Attorney General under 28 U.S.C. 2403(a) that the Secretary had called the constitutionality of Section 2 into question. *APA* Doc. 319. The United States intervened and filed a post-trial brief. *APA* Docs. 335, 335-1.

Upon considering the record and reviewing the parties' post-trial briefs, the district court found that plaintiffs had proved Section 2 violations as to all three challenged maps. *APA* Doc. 333, at 514. In a 516-page opinion, the court determined that plaintiffs had proven the three *Gingles* preconditions in some (but not all) of the regions in dispute, and that under the totality of circumstances the political process is not equally open to Black Georgians. *Id.* at 272-274, 480-483, 492-493. The court held that Georgia was required to draw one additional majority-Black congressional district, two additional majority-Black state senate districts, and five additional majority-Black state house districts. *Id.* at 509. The

court again rejected defendants' arguments that private plaintiffs cannot enforce Section 2, *id.* at 506-507, and that plaintiffs must "disprove that other race-neutral reasons, such as partisanship, are causing the racial bloc voting," *id.* at 201. The court also rejected the Secretary's "affirmative defense"—for which he "offered no argument or support"—that to "[grant] the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution." *Id.* at 508 (citations omitted).

## SUMMARY OF ARGUMENT

Three times over, the Secretary asks this Court to depart from longstanding precedent to avoid liability in this case. He asks this Court to engraft a new racial animosity requirement onto the well-established *Gingles* test, to declare Section 2 unconstitutional, and to hold that private parties cannot enforce Section 2. This Court should reject each of these arguments.

1. Section 2 plaintiffs need not prove that racially polarized voting in a jurisdiction is *caused* by racial animus. Analysis of the *Gingles* preconditions is limited to examining the electoral preferences of racial groups. Yet courts may consider evidence of partisan preferences at the totality-of-the-circumstances stage to determine whether all the evidence, taken together, supports the conclusion that a challenged voting practice impermissibly dilutes minority voting strength. However, such evidence can defeat a Section 2 vote-dilution claim only when,

despite apparent racial polarization, minority-preferred candidates have the potential to succeed under the existing electoral framework.

2.  Section 2's results test and remedial scheme are rational means of enforcing the Fifteenth Amendment.  The Secretary waived below any claim that Section 2 strays too far from the Fifteenth Amendment's ban on intentional discrimination, and the Supreme Court's recent decision in *Allen v. Milligan*, 599 U.S. 1 (2023), forecloses such a claim.  The Secretary likewise waived his claim that Section 2 has outlived its constitutionality.  Nor would this claim succeed on the merits:  Nothing in the Constitution or Supreme Court jurisprudence requires Congress to regularly update the reach of, and findings justifying, prophylactic statutes passed under the Reconstruction Amendments.  The Secretary's final constitutional argument—that Section 2 is unconstitutional if it can be applied to Georgia—is likewise foreclosed by *Milligan*.

3.  Finally, Section 2 is privately enforceable.  Section 2 indisputably contains rights-creating language, and Congress's intent to provide a private remedy to enforce the statute can be inferred from the personal nature of the rights that the VRA protects and from several other VRA provisions that evince Congress's understanding that Section 2 is privately enforceable.  Supreme Court precedent also supports a private right of action to enforce Section 2, and Congress repeatedly has ratified the decades-long understanding that private parties may

enforce Section 2.  But even if Congress did not contemplate a specific implied right of action, private plaintiffs nevertheless can enforce Section 2 under 42 U.S.C. 1983.

## ARGUMENT

### I.     Plaintiffs do not need to prove racial animus to establish a Section 2 vote-dilution claim.

The Secretary first argues (Br. 18-35) that plaintiffs had to show that Black and white voters in state legislative and congressional elections are polarized *because of* "racial animosity" (Br. 23) (citation omitted).  In so arguing, the Secretary misunderstands both plaintiffs' burden under Supreme Court and Eleventh Circuit precedent and the narrow circumstances in which evidence of partisan voting preferences can defeat a vote-dilution claim.

#### A.     Courts may consider evidence of partisan voting preferences only as part of Section 2's totality analysis.

To establish a vote-dilution claim under Section 2, a plaintiff must first establish the three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  Even if a plaintiff establishes the *Gingles* preconditions, Section 2 liability attaches only if the "totality of circumstances" ultimately supports a finding of vote dilution.  52 U.S.C. 10301(b).  Throughout, Section 2 imposes only one causation requirement:  the challenged practice must "result[] in a denial or abridgement" of voting rights "on account of race or color."  52 U.S.C. 10301.

The plaintiff therefore must prove only that the challenged law or practice "interacts with social and historical conditions *to cause an inequality* in the opportunities enjoyed by [minority] and [majority] voters." *Allen v. Milligan*, 599 U.S. 1, 17 (2023) (emphasis added; citation omitted). Section 2 does not contain a second causation requirement, forcing plaintiffs to prove that the majority votes against the minority's preferred candidates because of racial animus. "[I]t is patently clear that Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination," *id.* at 25 (citation omitted), either from the enacting legislature or from majority voters.

Accordingly, *Gingles* makes clear that while explanations for bloc voting may be considered in determining whether Section 2 liability should attach, they are not relevant to proving the three preconditions that plaintiffs must establish to get through the courthouse door. Eight Justices agreed in *Gingles* that analysis of the second and third preconditions for a vote-dilution claim should focus exclusively on whether racially polarized voting exists, not on whether partisan voting preference unconnected to race (or any other race-neutral factor) is the *reason* for such polarization.

Justice Brennan, joined by three other Justices, rejected the need for *any* motivation inquiry in Section 2 claims, including at the totality-of-circumstances

- 10 -

stage. *Gingles*, 478 U.S. at 63 (plurality opinion). This four-Justice plurality stated that "the reasons black and white voters vote differently have no relevance to the central inquiry of § 2." *Ibid.* Justice O'Connor, joined by three other Justices, "agree[d]" with the plurality that when plaintiffs provide "evidence of divergent racial voting patterns . . . to establish that the minority group is politically cohesive and to assess its prospects for electoral success"—*i.e.*, to prove the second and third *Gingles* preconditions— defendants cannot "rebut" this showing "by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters." *Id.* at 100 (O'Connor, J., concurring in the judgment). Justice O'Connor explained, however, that courts may consider evidence of non-racial reasons for apparent racial polarization in evaluating whether the totality of the circumstances supports finding a Section 2 violation. *Ibid.*

By misrepresenting Justice O'Connor's partial agreement with Justice White on a single topic as a complete embrace of his concurrence (Br. 23, 28), the Secretary asserts (Br. 22) that a majority of the *Gingles* Court required Section 2 plaintiffs to prove "a *racial* explanation for voting patterns."[2] But it is the

---

[2] Only Justice White believed that proof of racial motivation was ever *required*, at any stage of the analysis. *Gingles*, 478 U.S. at 83 (White, J.,

Secretary, not the district court, who "relie[s] on a plain misreading of *Gingles*."

Br. 21.  The relevant passages of Justice O'Connor's concurrence never state that

plaintiffs must provide evidence of the reason behind racially polarized voting

patterns.  *See* p. 11, *supra*.  The concurrence merely disagreed with the plurality's

view "that such evidence can *never* affect the overall vote dilution inquiry."

*Gingles*, 478 U.S. at 100 (emphasis added).  Equally clearly, the concurrence never

suggested that plaintiffs must prove that voters cast ballots motivated by racial

identity or animosity, or that evidence of partisan causation ever would be

dispositive.  Rather, the concurrence consistently described evidence of a non-

racial basis for voting preferences as "relevant," "probative," and worth

"consideration" in examining the totality of the circumstances.  *Id.* at 100-101.

Adhering to *Gingles*, courts of appeals consistently have held that evidence

of non-racial explanations for apparent racial polarization—such as partisan voting

preferences unrelated to race—are properly considered only at a later stage, as part

---

concurring).  And Justice White appeared to favor a rule that not even the
Secretary embraces, focusing solely on "the race of the candidates" rather than "the
race of the voter."  *Ibid.*  Justice O'Connor thought the plurality was wrong to
conclude that "the race of the candidate is *always* irrelevant in identifying racially
polarized voting," *Gingles*, 478 U.S. at 101 (O'Connor, J., concurring in the
judgment) (emphasis added), but "agreed with Justice White" no further than that
(Br. 28) (citation omitted).

of Section 2's totality analysis.[3]  And even at that stage, proof of racial motivation is not required.  *See Clerveaux v. East Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 231 & n.7 (2d Cir. 2021) (collecting cases).  This Court has likewise noted that "it is entirely possible that bloc voting (as defined by *Gingles*) could exist" while "[o]ther circumstances" relating to "the degree and nature of the bloc voting"—including partisanship—may "weigh against an ultimate finding of minority exclusion from the political process" at the totality stage.  *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc).

The lone exception, on which the Secretary heavily relies (Br. 4, 27, 31), is *League of United Latin American Citizens v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc).  But as its isolated position reflects—in three decades, no other circuit has joined the Fifth in examining partisan preference at the preconditions stage—*Clements* cannot be reconciled with *Gingles*.  And even *Clements* "did not

---

[3]  *See Cottier v. City of Martin*, 445 F.3d 1113, 1119 (8th Cir. 2006), *vacated on reh'g en banc*, 604 F.3d 553 (8th Cir. 2010); *United States v. Charleston Cnty.*, 365 F.3d 341, 347-348 (4th Cir. 2004); *United States v. Blaine Cnty.*, 363 F.3d 897, 912 & n.21 (9th Cir. 2004); *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999); *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194, 1199 (7th Cir. 1997); *Sanchez v. Colorado*, 97 F.3d 1303, 1316, 1321 (10th Cir. 1996); *Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995); *see also Nipper v. Smith*, 39 F.3d 1494, 1513-1514 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J., joined by Anderson, J.); *Georgia State Conf. NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025, at *19 (N.D. Ga. Oct. 26, 2023) (three-judge court); *cf. Clarke v. City of Cincinnati*, 40 F.3d 807, 813 n.2 (6th Cir. 1994) (reserving the issue).

hold that the plaintiff has the burden of negating all nonracial reasons possibly explaining plaintiffs' statistical case"; rather, the defendant may "offer evidence" to prove "the nonracial reasons for the voting patterns." *Teague v. Attala Cnty.*, 92 F.3d 283, 295 (5th Cir. 1996); *see Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (illustrating burden shift). This Court should "decline to adopt an interpretation of § 2 that would 'revise and reformulate the *Gingles* threshold inquiry that has been the baseline of our § 2 jurisprudence' for nearly forty years," *Milligan*, 599 U.S. at 26 (citation omitted), and that the Supreme Court reaffirmed just last year, *id.* at 25-26.

**B.    Evidence that racially polarized voting patterns are correlated with partisan preferences does not defeat a Section 2 vote-dilution claim.**

Courts may consider evidence of partisan voting preferences in performing Section 2's totality analysis. But such evidence can defeat a Section 2 claim only when the evidence shows that, despite apparent racial polarization, minority-preferred candidates have the potential to succeed under the existing electoral framework.

The purpose of Section 2 is to remedy "race-conscious politics," and "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984); *see Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282,

1305 (11th Cir. 2020) (stating that evidence of racial polarization "will ordinarily be the keystone of a dilution case" (citation omitted)).  The second and third *Gingles* preconditions provide proof "'that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race," *Milligan*, 599 U.S. at 19, so meeting those preconditions "will ordinarily create a sufficient inference that racial bias is at work," *Nipper v. Smith*, 39 F.3d 1494, 1525 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J., joined by Anderson, J.); *accord Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995).  A defendant can defeat a Section 2 claim in the face of such evidence only if the totality of the circumstances demonstrates that minority-preferred candidates can prevail notwithstanding such polarization in more than isolated instances or that racial polarization does not actually exist, despite apparent bloc voting on account of race.  *See Solomon*, 221 F.3d at 1225.

Justice O'Connor's concurrence in *Gingles* underscores the slender pathway available for a defendant to defeat a Section 2 claim based on evidence of partisan voting preferences.  A defendant cannot rebut proof of racial polarization merely by "offering evidence that the divergent racial voting patterns may be explained in part by causes other than race," like partisan voting preferences.  *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring in the judgment).  Instead, a defendant can defend against Section 2 liability by providing evidence at the totality stage "that a

candidate preferred by the minority group in a particular election was rejected by white voters *for reasons other than those which made that candidate the preferred choice of the minority group*." *Ibid.* (emphasis added). "Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections." *Ibid.*

Tracking Justice O'Connor's concurrence, courts consistently have found that evidence of a correlation between racially polarized voting patterns and partisan preferences does not disprove racial polarization. *See, e.g.*, *United States v. Charleston Cnty.*, 365 F.3d 341, 352-353 (4th Cir. 2004); *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 495-496 (2d Cir. 1999); *Sanchez v. Colorado*, 97 F.3d 1303, 1318-1322 (10th Cir. 1996); *Vecinos de Barrio Uno*, 72 F.3d at 983 & n.5. Even the Fifth Circuit in *Clements* cautioned that "courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation." 999 F.2d at 860-861. Rather, every court to reach the issue has placed on defendants the heavy burden of disproving the strong inference of race-conscious politics that comes from establishing the *Gingles* preconditions. *See* pp. 12-14 & n.3, *supra*; *contra* Br. 15, 27.

To meet that burden, defendants must do more than simply adduce evidence of a correlation between race and partisanship or an absence of animus against minority candidates. Relying solely on correlations between voters' race and the

- 16 -

party whose candidates they support, as the Secretary seeks to do, not only misunderstands the Section 2 inquiry but, in any event, cannot establish that non-racial factors were the predominant *motive* for minority or majority voters' choices.  Moreover, if race-party correlation alone could defeat a Section 2 vote-dilution claim, few such claims would be viable in the context of partisan elections.  This is because meeting both the second *Gingles* precondition (cohesion among minority-race voters) and the third (opposing bloc voting by majority-race voters) in partisan general elections typically requires proving that minority and white voters are polarized along *both* racial *and* partisan lines.  The Secretary's argument therefore would immunize jurisdictions from Section 2 liability in most modern partisan electoral systems, no matter the degree of race-conscious politics.

The approach outlined above does not transform Section 2 into a "partisan tool" or "one-way partisan ratchet" that harms Republican-majority jurisdictions and benefits minority voters alone.  Br. 15, 25-26.  This argument wrongly assumes that all jurisdictions have demographics and politics identical to Georgia's and that the nation's current political cleavages are etched in stone.  But that of course is not the case.  Section 2 will continue to play a role, and appropriately so, only in those jurisdictions "where the 'excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate'" based on the

interaction between the challenged voting practice and race-based conditions.
*Milligan*, 599 U.S. at 30 (citation omitted; alterations in original).

By contrast, the Secretary's proposed approach would create significant tension with Section 2's results test. The Supreme Court has consistently "reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent." *Milligan*, 599 U.S. at 25. To claim racial motivation, plaintiffs would in essence have to make "charges of racism on the part of . . . entire communities," exactly the sort of "unnecessarily divisive" charge that Congress sought to avoid with the results test. 1982 Senate Report 36. A racial animosity requirement also "cannot be squared with the VRA's demand that courts employ a more refined approach," *Milligan*, 599 U.S. at 26, by examining "the totality of circumstances" rather than declaring any factor dispositive, 52 U.S.C. 10301(b). And by requiring racial animosity to be at least the predominant cause of racially polarized voting (Br. 27), rather than just a motivating factor, the Secretary would "inject[] into" the results test "an evidentiary standard that even [the Court's] purposeful discrimination cases eschew," *Milligan*, 599 U.S. at 37-38.

The Secretary resists these implications of his argument, insisting that "intent and causation are entirely distinct concepts." Br. 28. But he never explains how, as a practical matter, a "racial *causation*" requirement differs from a racial

- 18 -

*intent* requirement (Br. 29), albeit one based on the intent of majority-race voters in the jurisdiction rather than the legislature. Indeed, the Secretary's brief consistently faults the plaintiffs for failing to show that white voters refuse to vote for Black candidates at the same rate as white candidates (Br. 30, 32-33), or that race caused voters' partisan preferences (Br. 31)—in other words, for failing to show evidence of voters' race-based intent. Eventually, the Secretary entirely collapses the two inquiries, criticizing the plaintiffs for not proving "racial animosity" or "white backlash." Br. 31, 34 (citations omitted).

Regardless, the fact remains that Section 2 does not require proof that majority voters supported candidates because of either the voters' or the candidates' race. Rather, to support a violation, plaintiffs must establish only that "minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 25. That the *Milligan* Court upheld the lower court's factual and legal determinations under *Gingles*, without mentioning any possible reasons for the stark racial polarization in Black and white voting patterns, is only the latest proof that Section 2 contains no "racial causation" requirement. *See id.* at 19-23.

**II.    Neither the passage of time nor the Secretary's claims about conditions in Georgia renders Section 2 unconstitutional.**

The Secretary raises various constitutional defenses to liability.  Br. 43-57. The Secretary has waived all but his final, as-applied claim, and each of his claims is unpersuasive in any event.  Section 2's case-by-case inquiry focuses on up-to-date considerations, authorizing race-conscious districting remedies only to the extent required to respond to the "regrettable reality" of racially dominated politics.  1982 Senate Report 34.  "Because section 2 'avoids the problem of potential overinclusion entirely by its own self-limitation,' nationwide application of this provision is undoubtedly constitutional."  *United States v. Blaine Cnty.*, 363 F.3d 897, 906 (9th Cir. 2004) (quoting 1982 Senate Report 43).

**A.    *Milligan* forecloses any claim that Section 2's results test or racially conscious remedies exceed Congress's Fifteenth Amendment authority.**

At times, the Secretary appears to argue that Section 2 is inherently unconstitutional because it extends too far beyond the Fifteenth Amendment's ban on intentional discrimination.  Br. 44-46.  To the extent the Secretary is making such an argument as to Section 2's results test generally, he has waived that defense by expressly disclaiming it below.  *See APA* Doc. 340, at 12 ("Defendants here do not claim that race-based redistricting is unconstitutional at all times.").

Regardless, forty years of binding precedent refutes his claim.  Just last year, the Supreme Court rejected a renewed constitutional attack on Section 2 and

upheld its results test.  *See Allen v. Milligan*, 599 U.S. 1, 38, 41 (2023); *see also*

*Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) (affirming

three-judge court decision where appellants asserted that Section 2's results test

exceeded Congress's Fifteenth Amendment powers).  This Court, too, has rejected

arguments that Section 2 exceeds Congress's powers.  *See United States v.*

*Marengo Cnty. Comm'n*, 731 F.2d 1546, 1556-1563 (11th Cir. 1984); *Johnson v.*

*Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999) (holding *Marengo County*

foreclosed challenge to Section 2).

Like the Secretary here, Alabama asserted in *Milligan* that Section 2, "as

construed by *Gingles* to require race-based redistricting in certain circumstances,

exceeds Congress's remedial or preventive authority under the Fourteenth and

Fifteenth Amendments."  *Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring in

part); *see id.* at 41 (majority opinion).  The Supreme Court roundly rejected this

claim.  It rebuffed the idea that application of *Gingles* gives minority groups

outsized political influence, noting that "the *Gingles* framework itself imposes

meaningful constraints on proportionality."  *Milligan*, 599 U.S. at 26 (majority

opinion).  The Court then reiterated prior precedent holding that Congress may,

"pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are

discriminatory in effect," and that "[t]he VRA's 'ban on [such] electoral changes

. . . is an appropriate method of promoting the purposes of the Fifteenth

- 21 -

Amendment." *Id.* at 41 (first alteration in original) (quoting *City of Rome v. United States*, 446 U.S. 156, 173, 177 (1980)). And it pointed to the four decades of cases that have applied *Gingles* and "authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Ibid.*; *see id.* at 44 (Kavanaugh, J., concurring in part).

The Secretary's complaints about the results test track those Alabama made in *Milligan* (*see* Br. 45), and they likewise should be rejected.

## B. Section 2's liability and remedial regime remains a rational means of enforcing the Fifteenth Amendment.

The Secretary principally suggests that Section 2 has outlived its constitutionality. He cites Justice Kavanaugh's concurring opinion in *Milligan*, which noted but declined to address the dissent's "temporal argument" that "the authority to conduct race-based redistricting cannot extend indefinitely into the future." 599 U.S. at 45; *see* Br. 43. He also relies on the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which struck down Section 4(b) of the VRA as invalid given changed conditions. This new argument, not raised in any detail until appeal, cannot avail the Secretary.

### 1. The Secretary waived his temporal claim.

The Secretary has not preserved a temporal constitutional claim. *See EEOC v. Eberspaecher N. Am. Inc.*, 67 F.4th 1124, 1134 n.10 (11th Cir. 2023). He did not raise this constitutional affirmative defense in his answer or his summary

- 22 -

judgment briefing, even though *Shelby County* long predated this case.  *See APA* Doc. 125, at 1-3; *APA* Doc. 230-1, at 27-29.  Nor did he raise this temporal claim in the supplemental briefing the district court ordered on the effect of *Milligan*, despite making a *different* temporal argument about *Gingles*'s racially polarized voting requirement.  *See APA* Doc. 263, at 18-19.[4]  Then, in the parties' pretrial filing, the Secretary again raised a different, as-applied constitutional defense:  that "grant[ing] the relief the plaintiffs seek" would require the court to "interpret the Voting Rights Act in a way that violates the U.S. Constitution."  *See APA* Doc. 280, at 23; Part II.C, *infra*.

The Secretary waited until the eve of trial, in his proposed findings of fact and conclusions of law, to mention his new *Shelby County* defense.  *APA* Doc. 317, at 173.  And even then, the Secretary did not develop the defense, merely quoting without further elaboration or explanation lines from Justice Kavanaugh's

---

[4]  The Secretary does not raise that separate constitutional claim on appeal. He does suggest (Br. 26-27) that constitutional avoidance principles support his proposed reading of the racially polarized voting requirement.  But the canon of constitutional avoidance is a tool for choosing between competing plausible statutory interpretations.  *Clark v. Martinez*, 543 U.S. 371, 385 (2005).  And for the reasons stated above, the Secretary's reading of Section 2 is not plausible.  *See* Part I, *supra*.  *Milligan* erased any doubt on this score by "reiterat[ing] that the third *Gingles* precondition does not require proof of racial causation and reaffirm[ing] the constitutionality of race sensitive remedies for § 2 violations."  *Nairne v. Ardoin*, No. 3:22-cv-178, 2024 WL 492688, at *11 (M.D. La. Feb. 8, 2024), *appeal docketed*, No. 24-30115 (5th Cir. Feb. 22, 2024).

*Milligan* concurrence and the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*), about the need for endpoints to race-based programs.  *APA* Doc. 317, at 173; *see APA* Doc. 333, at 508 (noting only the Secretary's as-applied challenge as a preserved affirmative defense).  The Secretary thus has "repeatedly waived" this affirmative defense "by failing to plead the defense in [his] Answer and by failing to move to amend [his] Answer before trial."  *Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1214-1215 (11th Cir. 2010).

The Secretary also has engaged in a more affirmative waiver.  After raising at best an as-applied challenge at trial (*see APA* Doc. 340, at 13-14; *but see APA* Doc. 333, at 508 (stating that the Secretary "offered no argument or support" even for his as-applied claim)), the Secretary renounced any temporal argument in his post-trial brief.  There, he agreed that he "do[es] not facially challenge Section 2's constitutionality" (*APA* Doc. 340, at 2 (citation omitted)); that he "do[es] not claim that race-based redistricting is unconstitutional at all times" (*id.* at 12); and that "[t]here may be jurisdictions where continuing conditions on the ground justify remedial districts" under Section 2 (*id.* at 12-13).  Now, on appeal, the Secretary makes the very facial challenge he disavowed, asserting that Section 2 must fall because it relies on outdated legislative findings to justify its continued existence.  Br. 43-44, 47-51.  Because he "affirmatively and intentionally relinquishe[d]" that

constitutional defense before the district court, the Secretary has waived it. *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir.) (en banc), *cert. denied*, 143 S. Ct. 95 (2022).

Even if the Secretary had merely forfeited the issue, however, his defense is not a "pure question of law," and hence this case is not "extraordinary enough" to warrant an exercise of discretion to excuse the forfeiture. *Campbell*, 26 F.4th at 875, 879 (citation omitted). As the Secretary himself argued in his post-trial response to the United States' brief, any temporal constitutional argument "must relate to the facts on the ground." *APA* Doc. 340, at 14. Whether those facts on the ground have changed so drastically, nationwide, as to render Section 2 facially unconstitutional is a quintessential factual question. And it is one that—as the Secretary appears to recognize (*ibid.*)—must be developed through the crucible of expert discovery and trial, not raised for the first time on appeal without the benefit of any record or ruling below.

> **2.    Congress does not need to continuously renew Section 2 for the statute to be constitutional.**

Even if the Secretary had properly preserved his temporal argument, it would fail.

### a. Congress need not continuously update Reconstruction Amendment laws and their supporting evidence to anticipate new lawsuits.

To the extent Justice Kavanaugh's concurrence in *Milligan* left any room to argue the point, Congress need not continually compile new evidence to support Section 2.

To start, the Secretary's argument relies on a faulty premise about the governing test. The "congruence and proportionality" standard applicable to Fourteenth Amendment legislation, *see City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), does not apply to the Fifteenth Amendment (*contra* Br. 45-46). Rather, Fifteenth Amendment legislation remains subject to the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). *See Milligan*, 599 U.S. at 41 (upholding Section 2 as "appropriate" legislation based on cases applying *McCulloch* standard); *Shelby Cnty.*, 570 U.S. at 556 (invalidating VRA's coverage formula after finding Congress's justification "irrational"); *id.* at 542 n.1 (stating that "*Northwest Austin* guides our review under both" the Fourteenth and Fifteenth Amendments); *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (declining to address defendant's argument that *City of Boerne* supplants the rationality standard).

Under this deferential test, Congress is "chiefly responsible for implementing the rights created" by the Fifteenth Amendment, and it "may use any

- 26 -

rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324, 326 (1966). These means may extend beyond bans on intentional discrimination. *See Milligan*, 599 U.S. at 41; *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282-283 (1999). Apart from the unique context at issue in *Shelby County*, the Supreme Court has never required continued updating of legislative evidence under the rationality standard—a standard that applies to nearly all congressional legislation. *See* pp. 31-32, *infra* (discussing the specific concerns animating the decision in *Shelby County*).

Nor is *City of Boerne*'s congruence-and-proportionality test appropriate here as a matter of first principles. "[T]he Fourteenth Amendment, unlike the Fifteenth, is not limited to denial of the franchise and not limited to the denial of other rights on the basis of race." *Tennessee v. Lane*, 541 U.S. 509, 555 (2004) (Scalia, J., dissenting). Rather, "the substantive provisions of the [Fourteenth] Amendment 'embody significant limitations on state authority'" in nearly every area and "thus 'fundamentally altered the balance of state and federal power struck by the Constitution.'" *Trump v. Anderson*, 144 S. Ct. 662, 666, 668 (2024) (per curiam) (citations omitted).

Given that pervasive reach, and "[t]o avoid placing in congressional hands effective power to rewrite the Bill of Rights," *Lane*, 541 U.S. at 556 (Scalia, J. dissenting), *City of Boerne* limited Congress's power under Section 5 of the

Fourteenth Amendment to preventive or remedial measures that are congruent and proportional to those rights as judicially interpreted, 521 U.S. at 520, 524. By contrast, "the permissive *McCulloch* standard" is "particularly appropriate with regard to racial discrimination" in voting, given its "limited context" and the centrality of this discrimination as "the principal evil against which the [Fifteenth Amendment] was directed." *Lane*, 541 U.S. at 563-564 (Scalia, J., dissenting); *see also City of Boerne*, 521 U.S. at 533 (pointing to VRA as paradigmatic constitutional legislation in part because it only "affect[s] a discrete class of state laws, *i.e.*, state voting laws").

However, Congress need not update its findings with respect to Section 2 under either test. Nothing in the Reconstruction Amendments' text or history causes statutes to lapse if not continually tended to by Congress, and *City of Boerne* never suggested that courts must determine whether the evidence justifying a statute passed under one of those amendments persists over time. To the contrary, courts routinely have upheld decades-old statutes based on the scope of the problem at the time of enactment, relying on the enacting Congress's legislative record. *See, e.g.*, *Vote.Org v. Callanen*, 89 F.4th 459, 486-487 & n.11 (5th Cir. 2023) (1964 statute); *National Ass'n of the Deaf v. Florida*, 980 F.3d 763, 773-774 (11th Cir. 2020) (1990 statute); *In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1323 (11th Cir. 1999) (1972 provision);

*Hundertmark v. State of Florida Dep't of Transp.*, 205 F.3d 1272, 1276 (11th Cir. 2000) (1973 provision).

The closest suggestion *City of Boerne* made to a requirement like the one the Secretary proposes was its statement that the Religious Freedom Restoration Act (RFRA) lacked a "termination date or termination mechanism." 521 U.S. at 532. But as the Secretary admits (Br. 48), the Court expressly disclaimed any notion "that § 5 legislation requires termination dates." *Id.* at 533. While those and other limits "tend to ensure Congress' means are proportionate," *ibid.*; *see* Br. 48, they are far from the only means of doing so. And the Court raised termination dates only when discussing Congress's power to enact laws that "*pervasively prohibit*[] *constitutional state action* in an effort to remedy or to prevent unconstitutional state action." *City of Boerne*, 521 U.S. at 533 (emphasis added).

Section 2 is no such statute. The provision requires case-by-case evaluation of a particular law, rather than across-the-board invalidation of an entire set of laws. *See* 52 U.S.C. 10301(b). And it requires courts to evaluate "the totality of circumstances," *ibid.*, to determine whether "a certain electoral law, practice, or structure interacts with social and historical conditions [in the defendant jurisdiction] to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives," *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Far from "pervasively prohibit[ing] constitutional state

action," *City of Boerne*, 521 U.S. at 533, Section 2's "exacting requirements,

instead, limit judicial intervention to 'those instances of intensive racial politics'

where the 'excessive role [of race] in the electoral process . . . den[ies] minority

voters equal opportunity to participate,'" *Milligan*, 599 U.S. at 30 (alterations in

original) (quoting 1982 Senate Report 33-34).

While the results test differs from a Fifteenth Amendment intent claim, "the

core injury targeted by both methods of analysis remains the same: intentional

discrimination." *In re Employment Discrimination Litig.*, 198 F.3d at 1322.

Though the results test requires more intense scrutiny than a traditional disparate

impact statute—and thus hews closer to an intent standard—this Court has

recognized that even "disparate impact provisions . . . can reasonably be

characterized as 'preventive rules' that evidence a 'congruence between the means

used and the ends to be achieved.'" *Ibid.* (citation omitted).

Moreover, Section 2 helps enforce the Fifteenth Amendment's right to be

free of race discrimination in voting.  When protecting such rights, "Congress has

greater latitude to abrogate immunity pursuant to its Section 5 powers." *National*

*Ass'n of the Deaf*, 980 F.3d at 772.  It need not "create an elaborate legislative

record and find a pattern of unconstitutional state conduct," as it would if Section 2

involved rights that "trigger[] only rational basis review." *Ibid.*  The record

Congress compiled in 1982 is more than enough.  *See Brnovich v. Democratic*

*Nat'l Comm.*, 141 S. Ct. 2321, 2333 (2021) (noting "the Senate Judiciary Committee's extensive survey of what it regarded as Fifteenth Amendment violations that called out for legislative redress").

> **b.**    ***Shelby County* does not alter Congress's duties with respect to Section 2.**

The Supreme Court's decision in *Shelby County*, striking down the coverage formula governing the VRA's preclearance regime, does not affect the analysis of Section 2. *Contra* Br. 48-49. As the Supreme Court itself stated in *Shelby County*, that decision "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." 570 U.S. at 557. And even if this Court were to ignore the Supreme Court's express statements, the decision's core reasoning is inapplicable to Section 2.

*Shelby County* relied on two primary principles. First, the preclearance regime imposed extraordinary burdens on States by requiring advance permission from the federal government "to implement laws that they would otherwise have the right to enact and execute on their own." *Shelby Cnty.*, 570 U.S. at 544. This was "a drastic departure from basic principles of federalism," *id.* at 535, that conflicted with the Framers' decision to reject a proposed federal "authority to 'negative' state laws" before they take effect, *id.* at 542. And second, preclearance implicated a separate structural limitation in the Constitution: the "'fundamental principle of *equal* sovereignty' among the States." *Id.* at 544 (citation omitted).

- 31 -

The Court thus held that "Congress—*if it is to divide the States*—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions." *Id.* at 553 (emphasis added). The Court nowhere suggested that the same requirement would "apply to different exercises of legislative authority under the Fourteenth and Fifteenth Amendments." *United States v. Diggins*, 36 F.4th 302, 315-316 (1st Cir.), *cert. denied*, 143 S. Ct. 383 (2022).

Neither *Shelby County* rationale applies to Section 2. First, in contrast to Section 5, "section 2 does not engage in such a pervasive prohibition of constitutional state conduct." *Blaine Cnty.*, 363 F.3d at 906. Whereas Section 5 required covered jurisdictions to seek preclearance from a three-judge federal court or the Department of Justice before implementing any change in election laws, Section 2 relies on plaintiffs to sue States or localities and carry the burden of establishing a statutory violation. *See Shelby Cnty.*, 570 U.S. at 572 (Ginsburg, J., dissenting); *Blaine Cnty.*, 363 F.3d at 906. "This burden is significant," requiring plaintiffs to satisfy both the *Gingles* preconditions and the totality-of-circumstances test rather than relying on the more relaxed standard of proof under Section 5. *Blaine Cnty.*, 363 F.3d at 906; *see Shelby Cnty.*, 570 U.S. at 545 (noting the "important differences" between Section 2 suits "and preclearance proceedings").

Second, Section 2 applies to all jurisdictions. *Shelby County* focused heavily on Section 5's violation of States' equal sovereignty. The Court emphasized that Section 5 forced covered States to "wait[] months or years and expend[] funds to implement a validly enacted law" while other states "can typically put the same law into effect immediately," and reasoned that this "'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'" 570 U.S. at 544, 550-551 (citations omitted); *see id.* at 535-536, 550, 552-553 (reiterating equal sovereignty concerns). By contrast, *Shelby County* repeatedly invoked Section 2's "nationwide" application to "all 50 States." *Id.* at 536-537, 557.

Section 2's case-by-case approach assuages any lingering concern about calibrating the statute to "current conditions," *Shelby Cnty.*, 570 U.S. at 553, or determining an endpoint for its remedies (Br. 55-57). Indeed, the Secretary acknowledged below that "the properly applied *Gingles* test is self-regulating" and therefore constitutional. *APA* Doc. 317, at 173. That is because, "as residential segregation decreases—as it has 'sharply' done since the 1970s—satisfying traditional districting criteria such as the compactness requirement 'becomes more difficult.'" *Milligan*, 599 U.S. at 28-29 (citation omitted). So too, when the effects of earlier discrimination and the use of racial appeals diminish in a jurisdiction, plaintiffs will have a harder time proving, under the totality of circumstances, that it is a place in which the "excessive role [of race] in the electoral process . . .

- 33 -

den[ies] minority voters equal opportunity to participate." *Id.* at 30 (citation omitted; alterations in original). In these ways, Section 2 provides its own "logical end point." *SFFA*, 600 U.S. at 221 (citation omitted); *see also Milligan*, 599 U.S. at 29 (noting decline in successful Section 2 challenges over time).

> ### c.   A continuous "updating" requirement would unduly burden Congress and undermine the rule of law.

The form of analysis the Secretary urges on this Court is legally inapposite and boundless. It would require continuous legislative updating not only of the Voting Rights Act, but of myriad statutes passed under the Reconstruction Amendments—even if the Supreme Court or this Court has already rejected challenges to them. Statutes as varied as the Family and Medical Leave Act, *see Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 740 (2003), Title II of the Americans with Disabilities Act, *see Lane*, 541 U.S. at 533-534; *National Ass'n of the Deaf*, 980 F.3d at 773-774; *Association for Disabled Ams., Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005), and the disparate impact provisions of the Fair Housing Act and Title VII of the Civil Rights Act, *see Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540, 545-546 (2015); *In re Employment Discrimination Litig.*, 198 F.3d at 1322-1324, would become subject to reexamination. Such a regime would severely undermine the finality of court decisions and eviscerate *stare decisis*.

- 34 -

Nor does the Secretary provide any guidance on how "contemporary" legislative findings must be to pass muster under his proposed test. Br. 51. Do such statutes presumptively sunset after twenty years? Ten? Five? The Secretary does not say. After every election, jurisdictions could point to fresh data and suggest that it changes the constitutional equation enough to invalidate even recently compiled evidence. Indeed, the Secretary himself focuses primarily on Georgia election results from 2020 to 2022 to claim Black political success (Br. 2, 6-7, 32-33, 39-40), and then points to this same evidence to challenge Section 2's constitutionality (Br. 53, 55). And he does so only a year after the Supreme Court upheld the statute against Alabama's similar attack. *See Milligan*, 599 U.S. at 41.

Justice Scalia's two-decade-old critique of the congruence and proportionality test itself applies even more strongly to the Secretary's proposed regime: It "casts this Court in the role of Congress's taskmaster. Under it, the courts (and ultimately this Court) must regularly check Congress's homework to make sure that it has identified sufficient constitutional violations to make its remedy congruent and proportional." *Lane*, 541 U.S. at 558 (Scalia, J., dissenting). This Court is "ill advised to adopt or adhere to constitutional rules that bring [it] into constant conflict with a coequal branch of Government." *Ibid.* Litigants could force courts into new conflicts far faster than Congress could keep updating its legislative findings, with any on-the-ground difference being cited as a reason to

declare a law unconstitutional. Nothing in the Constitution's grant of power to "enforce" the Fifteenth Amendment, U.S. Const. Amend. XV, § 2, imposes such a regime.

### C. The Secretary's disagreement with the district court's ruling does not render Section 2 unconstitutional.

In his lone arguably preserved claim, the Secretary asserts that the district court's application of Section 2 to Georgia renders the statute unconstitutional. Br. 55, 57; *but see APA* Doc. 333, at 508 (stating that the Secretary "offered no argument or support for this assertion through motion practice or at trial"). But the Secretary never explains how imposing liability in these cases would be enough evidence by itself to show that race-based redistricting is no longer constitutional anywhere. Indeed, below, he expressly denied that he even sought to argue as much. *See APA* Doc. 340, at 2.

Rather, the Secretary asserts only that, if this Court were to find a Section 2 violation in "modern-day Georgia," then Section 2 must be unconstitutional. Br. 57; *see APA* Doc. 317, at 173. But that merely reflects the Secretary's disagreement over whether this case presents one of "those instances of intensive racial politics" severe enough to violate Section 2 in the first place. *Milligan*, 599 U.S. at 30 (citation omitted; alterations in original). The Secretary thus seeks to bootstrap a statutory argument into a constitutional one. Br. 53-55.

- 36 -

Alabama made a similar "unconstitutional if it can reach me" argument in *Milligan*. Alabama asserted that Section 2 "is unconstitutional as the District Court applied it here." *Milligan*, 599 U.S. at 38. Alabama claimed that the district court ordered it to replace a "race-neutral, least-changes congressional map" with "a racial gerrymander," that the district court read Section 2 to "guarantee political 'feast'" to one group, and that the district court's ruling meant that "a State with racially polarized voting can violate §2 by failing to create another majority-minority district wherever one is possible." Br. of Appellants at 73-74, *Milligan*, 599 U.S. 1 (Nos. 21-1086 & 21-1087); *see id.* at 75-79 (making similar arguments under Fourteenth Amendment). The Supreme Court flatly rejected these arguments, *see Milligan*, 599 U.S. at 41, and this Court should do the same.

The Secretary argues that recent Black electoral success in Georgia indicates that "race-based redistricting under § 2 is no longer justified." Br. 52. His evidence, however, falls far short of showing that Section 2 is invalid. He often cites statewide statistics to prove the "extensive success" of Black candidates in Georgia. Br. 53. But Section 2 itself is more nuanced: As the Supreme Court has repeatedly admonished, it requires an "intensely local appraisal" to determine whether "intensive racial politics" still infects particular areas. *Milligan*, 599 U.S. at 19, 30 (citations omitted). Nor did the district court find that Black voters were proportionally represented, even statewide. *APA* Doc. 333, at 263-266, 427-428.

The Secretary's evidence also focuses solely on Black voters (*see* Br. 35-43, 52-53), and so cannot prove that Georgia's (or America's) elections are equally open to *every* group covered by the statute, as would be required to hold Section 2's entire remedial regime invalid either in Georgia or nationwide (Br. 52); *see McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022).  While his evidence is relevant to the statutory question in this case—whether the challenged maps deny an equal opportunity for Black voters to elect candidates of their choice—it is far too limited to justify a finding that Section 2 has outlived its constitutional usefulness.[5]

More fundamentally, however, the Secretary's argument misunderstands how Section 2 probes for "intensive racial politics."  *Milligan*, 599 U.S. at 30 (citation omitted).  While minority electoral success plays an important role in the analysis, "the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited,

---

[5]  Even while eschewing the required "intensely local appraisal," *Milligan*, 599 U.S. at 19 (citation omitted), the Secretary often casts his gaze too narrowly as to the evidence relevant to that appraisal.  His arguments focus primarily on the success of Black and other minority-race candidates, while adverting at best secondarily to minority-*preferred* candidates.  Br. 2, 6-7, 15-16, 30, 32-33, 52, 56. By placing so much emphasis on *candidates'* race, the Secretary elides the statute's focus on "minority *voters*" and whether they "have less opportunity than other members of the electorate to participate in the political process and to elect *representatives of their choice*," whatever those representatives' own race. *Milligan*, 599 U.S. at 25 (emphases added) (quoting 52 U.S.C. 10301(b)).

canvassing of relevant facts." *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994); *cf. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (for discriminatory purpose claims, likewise requiring "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available"). Thus, while a minority group's success in electing preferred candidates roughly in proportion to their percentage of the population "is 'a relevant fact in the totality of circumstances,'" it is not "a 'safe harbor' for States in complying with § 2." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006) (citation omitted).

In some jurisdictions, "racial politics do dominate the electoral process," and a district map perpetuates the ongoing effects of discrimination to prevent minority voters from fully translating their numbers into political power. 1982 Senate Report 33. In such circumstances, the district map will still "deny minority voters equal opportunity" and justify a race-conscious remedy. *Ibid.*; *accord Milligan*, 599 U.S. at 30; *De Grandy*, 512 U.S. at 1018-1019 & n.16. So understood, Section 2's results test remains valid legislation to enforce the Fifteenth Amendment's ban on race discrimination in voting.

## III. Both the VRA and 42 U.S.C. 1983 provide private plaintiffs a right of action to sue under Section 2.

In a last-ditch effort to avoid liability, the Secretary asks (Br. 57-64) this Court to hold that private plaintiffs cannot enforce Section 2. They can.

- 39 -

Plaintiffs "seeking to enforce their rights under [a statutory] provision" lacking an express cause of action can proceed on "two different paths": (1) through a right of action implied from the substantive statute itself, or (2) under 42 U.S.C. 1983, when suing defendants who acted under color of law. *Colón-Marrero v. Vélez*, 813 F.3d 1, 15 (1st Cir. 2016). These two paths "'overlap' in that both inquiries must begin with the question of whether 'Congress *intended to create a federal right*.'" *Schwier v. Cox*, 340 F.3d 1284, 1290 (11th Cir. 2003) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)). The two paths diverge, however, at the second step of the analysis. "[A] plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga*, 536 U.S. at 284 (citation omitted). But "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Ibid.* (citation omitted).

Private plaintiffs can enforce Section 2 under both theories. This Court already has examined the VRA and concluded that it creates a private right of action to enforce Section 2. *See Alabama State Conf. of NAACP v. Alabama*, 949 F.3d 647, 651-652 (11th Cir. 2020) (*Alabama NAACP*), *cert. granted, judgment vacated as moot*, 141 S. Ct. 2618 (2021); *Lewis v. Governor of Alabama*, 896 F.3d

1282, 1293 (11th Cir. 2018), *vacated for rehearing en banc*, 914 F.3d 1291 (11th Cir.) (en banc), *on rehearing en banc*, 944 F.3d 1287 (11th Cir. 2019) (en banc).[6] This Court should hold that Section 2 contains an implied right of action. But regardless of whether the statute creates its own private remedy, private plaintiffs can bring their Section 2 claims under 42 U.S.C. 1983, a path the Secretary does not even contest.

### A.    Section 2 creates personal rights.

Section 2 provides a personal right to affected voters. The Secretary's opening brief does not address (Br. 57-64), let alone dispute, this issue.

A statute contains rights-creating language "where the provision in question is phrased in terms of the persons benefited and contains rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 284, 287); *see Blessing v. Freestone*, 520 U.S. 329, 340-341 (1997) (articulating factors for identifying personal rights). Section 2 protects "*the right of any citizen* of the

---

[6] Though *Alabama NAACP* was vacated as moot, the vacatur was "unrelated to its [right-of-action] holding" and its substantive analysis remains "persuasive." *United States v. Utsick*, 45 F.4th 1325, 1335 (11th Cir. 2022). This Court's vacatur and en banc review of *Lewis* did not involve the Section 2 claim in that case, and so also were "unrelated" to the panel's right-of-action holding. *Ibid.*; *see Lewis*, 944 F.3d at 1294 n.1.

United States to vote" from "denial or abridgement . . . on account of race or color [or language minority status]."  52 U.S.C. 10301(a) (emphasis added); *see also* 52 U.S.C. 10301(b) (focusing on "*members* of a class of citizens protected by subsection (a)" (emphasis added)).  The statute thus "grants" individual citizens "a right to be free from" discriminatory voting practices. *Chisom v. Roemer*, 501 U.S. 380, 392 (1991) (citation omitted); *see also Talevski*, 599 U.S. at 184 (finding that statute "framing" relevant section in terms of rights is "indicative of an individual 'rights-creating' focus" (quoting *Gonzaga*, 536 U.S. at 284)).  The statute mandates that States and political subdivisions refrain from "impos[ing] or apply[ing]" such practices.  52 U.S.C. 10301(a).  And it defines "the benefited class":  citizens.  *Talevski*, 599 U.S. at 183 (citation omitted).  It is difficult to imagine more explicit or clearer rights-creating language.  *See Georgia State Conf. NAACP v. Georgia*, No. 1:21-cv-5338, 2022 WL 18780945, at *4 (N.D. Ga. Sept. 26, 2022) (three-judge court) (per curiam).

**B.    Congress provided a private remedy to enforce Section 2.**

Since Section 2 creates private rights, private parties may enforce it if Congress also intended to create a private remedy.  In conducting that analysis, "the inquiry both begins and ends with a careful examination of the statute's language." *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc).  Here, the VRA exudes Congress's intent to create a private remedy.

### 1. The VRA's text evinces Congress's intent to provide a private right of action to enforce Section 2.

Section 2 and other provisions of the VRA evince Congress's intent to provide a private remedy for violations.

a. While not "*sufficient*" by itself to answer the question, *In re Wild*, 994 F.3d at 1255 n.11, the fact that Section 2 plainly contains rights-creating language creates a strong presumption that Congress also intended to create a private remedy to enforce those rights. That is because "the right- or duty-creating language of [a] statute has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon v. University of Chicago*, 441 U.S. 677, 690 n.13 (1979); *see Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) (characterizing this component of the private-right-of-action analysis as "critical").

The presumption that Congress intends to provide a private remedy where it includes rights-creating language is even stronger here because voting rights typically are considered "private rights," principally enforced by individual voters. *United States v. Raines*, 362 U.S. 17, 27 (1960). Indeed, the Supreme Court has found "merit in the argument that the specific references [in the VRA] to the Attorney General were included to give the Attorney General power to bring suit to enforce what might otherwise be viewed as 'private' rights." *Allen v. State Bd. of Elections*, 393 U.S. 544, 555 n.18 (1969) (quoting *Raines*, 362 U.S. at 27).

b. This Court also "examine[s] the statutory structure within which the provision in question is embedded." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1295 (11th Cir. 2015) (citation omitted).  Congress's intent to provide a private remedy to enforce Section 2 can be inferred, at a minimum, from the text of Sections 3, 12(f), and 14(e) of the VRA.

i. **Section 3** reflects Congress's understanding that private plaintiffs can enforce the VRA's substantive provisions—including Section 2.  After Congress passed the original 1965 Act, *Allen* construed the VRA as permitting private suits. 393 U.S. at 556-557.  Congress amended Section 3 in 1975 to provide specific remedies to "the Attorney General or an aggrieved person" in lawsuits brought "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. 10302 (emphasis added).  This Court has previously relied on Section 3's "aggrieved person" language to hold that that the VRA "explicitly provides remedies to private parties to address violations under the statute," including Section 2 violations.  *Alabama NAACP*, 949 F.3d at 652.  The Fifth Circuit has relied on this Court's holding, noting that *Alabama NAACP* "discussed the issue at length and also concluded there was a private right of action under Section 2."  *Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023).

The Secretary acknowledges (Br. 63) that Section 3 applies to some sections of the VRA, such as Section 5, but asserts that it does not apply to Section 2.  Yet

Section 2, as prophylactic legislation, enforces the Fourteenth and Fifteenth Amendments no less than Section 5.  *See* 1982 Senate Report 40 ("[T]o enforce fully the Fourteenth and Fifteenth Amendments, it is necessary that Section 2 ban election procedures and practices that result in a denial or abridgment of the right to vote.").  Nor does the phrase "aggrieved person" differentiate, as the Secretary would have it (Br. 63), between rights of action "that *already*" had been recognized "when that term was added" in 1975 and others that the text equally indicates.

Likewise, Section 12's express authorization for the Attorney General to bring civil suits (Br. 63) does not alter Section 3's "explicit" recognition that "private parties can sue to enforce the VRA."  *Alabama NAACP*, 949 F.3d at 651. Section 3 before "gave enforcement authority only to the Attorney General of the United States," *ibid.*, yet Congress amended the statute in 1975 precisely to "provide the same remedies to private parties as had formerly been available to the Attorney General alone," *Morse v. Republican Party of Va.*, 517 U.S. 186, 233 (1996) (opinion of Stevens, J.).

And finally, it is in no way strange that Section 3 recognizes causes of action for numerous voting rights laws.  Br. 63.  Some provisions, like 42 U.S.C. 1983, authorize causes of action for far wider sets of federal rights.  Besides, the VRA "is a major piece of federal civil rights legislation" that is "written in starkly broad terms."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 680 (2020).  Even if holding that

- 45 -

Section 3 as written could be considered an "elephant" (Br. 64), "where's the mousehole?" *Bostock*, 590 U.S. at 680.

ii. **Section 12(f)** grants federal courts jurisdiction over "proceedings instituted pursuant to [Section 12 of the VRA] and" states that they "shall exercise the same without regard to whether *a person asserting rights* under the provisions of [the VRA] shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. 10308(f) (emphasis added); *see* 1 U.S.C. 1 (defining "person" to include, among other things, "corporations," "associations," and "societies"). Section 12(f) applies to "chapters 103 to 107" of the VRA—*i.e.*, to the full panoply of the statute's substantive provisions. 52 U.S.C. 10308(f). Section 12(f) therefore reflects Congress's intent that federal courts have subject-matter jurisdiction over private suits to enforce the VRA's substantive provisions, including Section 2. *Allen*, 393 U.S. at 555 n.18 (finding "force" to the argument that Section 12(f) "necessarily implies that private parties may bring suit under the [VRA]"). Indeed, because Congress repeatedly stated its intent for a private right of action to exist under Section 2—*see* 1982 Senate Report 30; H.R. Rep. No. 227, 97th Cong., 1st Sess. 32 (1981) (1981 House Report)—it would have understood Section 12(f) as allowing district courts to hear such suits.

iii. **Section 14(e)** similarly indicates that private plaintiffs may sue to enforce Section 2. It provides that, "[i]n any action or proceeding to enforce the

- 46 -

voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow *the prevailing party, other than the United States*, a reasonable attorney's fee."  52 U.S.C. 10310(e) (emphasis added).  "Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees."  *Morse*, 517 U.S. at 234 (opinion of Stevens, J.); *see also Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401-402 (1968) (per curiam) (construing nearly identical attorney's fee provision in Title II of 1964 Civil Rights Act to apply to private plaintiffs, before Congress added Section 14(e) to VRA).  Like Section 3, then, Section 14(e) reflects Congress's understanding that private plaintiffs can bring claims under the VRA's substantive provisions—including Section 2.  *See Morse*, 517 U.S. at 234 (opinion of Stevens, J.); *see also* 1981 House Report 32 (stating that if private plaintiffs prevail under Section 2, "they are entitled to attorneys' fees under [Section 14(e)] and [42 U.S.C.] 1988").

iv.  To be sure, the VRA also authorizes civil suits by the United States to enforce the statute's substantive provisions.  *See* 52 U.S.C. 10308(d) and (e).  But that is because Congress had to provide the Attorney General, who cannot sue under Section 1983, authority to enforce the statute.  Regardless, since *Sandoval*, this Court has never found that judicial enforcement by the Attorney General is sufficient, by itself, to overcome all other evidence of congressional intent to create a private remedy.  *See In re Wild*, 994 F.3d at 1265-1266 (restrictions on private

remedy and "detailed administrative-enforcement apparatus"); *id.* at 1255-1256 (citing prior Eleventh Circuit cases applying *Sandoval* framework to deny private right of action, none of which involved solely a public judicial enforcement mechanism).

> **2.    Supreme Court and lower-court precedent alike confirm that the VRA creates a private remedy for Section 2 violations.**

The Supreme Court's decisions in *Morse* and *Allen*, and lower court decisions from this and other circuits, make clear that a private right of action exists to enforce Section 2.

i. Any look at precedent begins, and should end, with the Supreme Court's decision in *Morse*, 517 U.S. 186. There, "[a] majority of the Supreme Court" held "that section 2 of the Voting Rights Act contains an implied private right of action." *Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014). Five Justices recognized that although Section 2 "provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" *Morse*, 517 U.S. at 232 (opinion of Stevens, J., joined by Ginsburg, J.) (omission in original) (quoting 1982 Senate Report 30); *accord id.* at 240 (opinion of Breyer, J., concurring in the judgment, joined by O'Connor & Souter, JJ.). Decades earlier, the Court had found a private right of action to enforce Section 5 of the VRA. *See Allen*, 393 U.S. at 556-557. The

Court in *Morse* recognized that Congress had likewise intended to create a private right of action to enforce the prohibition on poll taxes in Section 10 of the VRA. *See* 517 U.S. at 232-234 (opinion of Stevens, J.). And it did so largely because it would be anomalous for Congress not to have intended such a right of action for Section 10 when Congress had authorized one to enforce both Section 5 *and* Section 2. *Id.* at 232; *id.* at 240 (Breyer, J., concurring).

Twice in recent years, this Court has followed the Supreme Court's lead and ruled that private plaintiffs have a right of action to enforce Section 2. *Alabama NAACP*, 949 F.3d at 651-652; *Lewis*, 896 F.3d at 1293; *accord, e.g.*, *Singleton v. Merrill*, No. 2:21-cv-1530, 2022 WL 265001, at *79 (N.D. Ala. Jan. 24, 2022) (three-judge court), *aff'd sub nom. Milligan*, 599 U.S. 1; *Georgia State Conf. NAACP*, 2022 WL 18780945, at *6 (three-judge court). The Fifth Circuit relied in part on *Alabama NAACP* and *Morse* to likewise hold that Section 2 created a private right of action. *Robinson*, 86 F.4th at 587-588. The Sixth Circuit, too, has held that Section 2 creates a private right of action. *See Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999).

Exercising this statutory right, private plaintiffs since 1982 have brought more than 400 cases alleging violations of Section 2 that have resulted in judicial decisions. *See* Ellen D. Katz et al., *To Participate and Elect: Section 2 of the Voting Rights Act at 40*, Univ. Mich. L. Sch. Voting Rights Initiative (2022),

https://voting.law.umich.edu (last updated July 1, 2023) (providing data that are the basis for this estimate).  Over that same period, the United States has brought just 44 Section 2 cases.  *See Voting Section Litigation*, U.S. Dep't of Justice, https://perma.cc/V5XK-Z7L8 (last updated Jan. 17, 2024).

ii.  Congress has ratified the consensus view that Section 2 is privately enforceable.  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009) (citation omitted).  In repeatedly amending the VRA, Congress has never questioned the uniform view that Section 2 is privately enforceable.  Pub. L. No. 91-285, 84 Stat. 314 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-205, 96 Stat. 131 (1982); Pub. L. No. 109-246, 120 Stat. 577 (2006).  Moreover, in the 1982 Senate Report that the Supreme Court called the "authoritative source for legislative intent" behind Section 2, *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986), Congress "reiterate[d] the existence of the private right of action under section 2," 1982 Senate Report 30; *see* 1981 House Report 32.  Congress has had no reason to codify an express right of action to enforce Section 2 when private plaintiffs have enforced Section 2 for decades.

### 3.    The Eighth Circuit's outlier decision is unpersuasive.

Relying on a single decision from the Eighth Circuit, *see Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) (*Arkansas NAACP*), *reh'g en banc denied*, 91 F.4th 967 (8th Cir. 2024) (*Arkansas NAACP II*), the Secretary asks this Court (Br. 57-58) to abandon the otherwise uniform case law holding that private plaintiffs may enforce Section 2.  But *Arkansas NAACP* gives short shrift to that precedent, and to statutory text.

First, echoing *Arkansas NAACP*, the Secretary asserts (Br. 62) that *Morse* is a "fractured" decision that addressed Section 2 only in passing.  Not so.  For one thing, Supreme Court decisions create binding holdings even "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices."  *Marks v. United States*, 430 U.S. 188, 193 (1977).  Here, however, there is no need to determine the "narrowest grounds" of the decision in *Morse*, *ibid.* (citation omitted), because Justice Stevens's lead opinion and Justice Breyer's concurrence followed the same reasoning in determining that Section 2 was privately enforceable, and that Section 10 therefore was, as well, *see Morse*, 517 U.S. at 232; *id.* at 240 (Breyer, J., concurring).

Second, *Arkansas NAACP*'s treatment of *Morse*'s key reasoning as a mere "background assumption[]," 86 F.4th at 1215-1216, misreads that decision.  The *Morse* Court held that private plaintiffs must be able to enforce Section 10 because

"[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language."  517 U.S. at 232 (opinion of Stevens, J.); *accord id.* at 240 (Breyer, J., concurring) (stating that *Allen*'s rationale "applies with similar force not only to § 2 but also to § 10").  Because private plaintiffs' ability to enforce Section 2 was the linchpin of *Morse*'s holding, that determination, too, constitutes part of the Court's holding.

Hence, any conclusion that Section 2—unlike Sections 5 and 10—lacks a private right of action would be illogical and defy vertical *stare decisis* principles. *Accord Arkansas NAACP II*, 91 F.4th at 970 (Colloton, J., dissenting from denial of en banc review) (criticizing "panel majority's unusual notion of 'dicta,' and its refusal to treat *Morse* as controlling precedent for an inferior court").  In any event, "[e]ven if the relevant language in [*Morse*] is dicta," lower courts are "obligated to respect it."  *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) (citations omitted).

The Secretary also invokes *Arkansas NAACP* (Br. 63) to suggest that VRA Section 3 is limited to "constitutional challenges under 42 U.S.C. 1983, 'suits under § 5,' or any other causes of action 'that [the Court] might recognize in the future.'"  Br. 63 (alteration in original; citation omitted); *see Arkansas NAACP*, 86 F.4th at 1211.  But unlike Justice Thomas's dissenting opinion in *Morse*, on which

the *Arkansas NAACP* majority and the Secretary rely, a majority of the Court in *Morse* read Section 3 to authorize private enforcement of the VRA, including Section 2. *See Alabama NAACP*, 949 F.3d at 652 n.5. And even if it had not, Justice Thomas's interpretation of Section 3 does not flow from any reasonable meaning of the phrases "aggrieved person" or "prevailing party, other than the United States." 52 U.S.C. 10302, 10310(e). *See* Part III.B.1, *supra*.

### C.    Private plaintiffs can enforce Section 2 via 42 U.S.C. 1983.

Private plaintiffs also can enforce Section 2 via Section 1983's general cause of action. *See* 42 U.S.C. 1983. Here, plaintiffs invoked Section 1983 in their amended complaints (*APA* Doc. 141, at 4, 57; *Pendergrass* Doc. 120, at 4; *Grant* Doc. 96, at 4) and so can take advantage of this alternative route, as well. The Secretary does not even attempt to argue otherwise.[7]

Once a statute is shown to create a personal right, that right is presumptively enforceable through Section 1983. Defendants can rebut that presumption only by "demonstrat[ing] that Congress shut the door to private enforcement either [1] expressly, through specific evidence from the statute itself" or "[2] impliedly,

---

[7] The Eighth Circuit expressly reserved this question because, unlike private plaintiffs here, the plaintiffs in *Arkansas NAACP* did not plead Section 1983 in their complaint. *See* 86 F.4th at 1218; *Arkansas NAACP II*, 91 F.4th at 967 (Stras, J., concurring in denial of rehearing en banc). The enforceability of Section 2 of the VRA via Section 1983 is pending before the Eighth Circuit in *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 23-3655.

by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Gonzaga*, 536 U.S. at 284 n.4 (citations and internal quotation marks omitted). Congress did not "shut the door to private enforcement" of Section 2 explicitly, *ibid.*, because "there is certainly no specific exclusion of private actions" in the Act, *Allen*, 393 U.S. at 555 n.18.

Nor did Congress impliedly displace Section 1983. The Supreme Court recently reiterated that a rights-creating statute cannot implicitly foreclose Section 1983's remedy unless it includes "a *private* judicial right of action, a *private* federal administrative remedy, or any carefu[l] congressional tailor[ing] that § 1983 actions would distort." *Talevski*, 599 U.S. at 190 (emphases added; alterations in original; internal citations and quotation marks omitted). Neither Section 2 nor the VRA overall includes any of these things. The VRA merely creates an additional, *public* right of action for the Attorney General. 52 U.S.C. 10308(d).

Unlike in the implied-right-of-action context (Br. 59-60), provision of this public cause of action does not even *suggest* possible preclusion of Section 1983, much less prove it, because enforcement by the Attorney General would "'complement,' not 'supplant, § 1983.'" *Talevski*, 599 U.S. at 190 (citation omitted). Indeed, this Court has already examined a near-identical statutory structure in the Civil Rights Act—one that likewise included an Attorney General

enforcement provision—and held that the Materiality Provision of that statute is enforceable via Section 1983. *Schwier*, 340 F.3d at 1296. In addition, although not necessary for enforcement through Section 1983, other VRA provisions confirm the private enforceability of the statute. *See* pp. 44-47, *supra* (discussing Sections 3, 12(f), and 14(e)).[8]

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment.

Respectfully submitted,

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA  30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

---

[8]  The existence of a right of action implied from the VRA itself does not preclude Section 1983 enforcement. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009) ("This Court has never held that an implied right of action had the effect of precluding suit under § 1983.").

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,953 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  April 8, 2024