Nos. 23-13916 & 23-13921
(consolidated with No. 23-13914)

# In the United States Court of Appeals for the Eleventh Circuit

COAKLEY PENDERGRASS et al.,
*Plaintiffs-Appellees*,

ANNIE LOIS GRANT et al.,
*Plaintiffs-Appellees*,

v.

SECRETARY OF STATE OF GEORGIA,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Georgia
Nos. 1:21-cv-05339 and 1:22-cv-00122—Steve C. Jones, Judge

## BRIEF FOR *PENDERGRASS* AND *GRANT* APPELLEES

Joyce Gist Lewis
Adam M. Sparks
KREVOLIN & HORST, LLP
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
(404) 888-9700

Abha Khanna
Makeba Rutahindurwa
ELIAS LAW GROUP LLP
1700 Seventh Ave,
Suite 2100
Seattle, WA 98101
(206) 656-0177

Michael B. Jones
ELIAS LAW GROUP LLP
250 Mass. Ave NW,
Suite 400
Washington, DC 20001
(202) 968-4490

*Counsel for Plaintiffs-Appellees in Nos. 23-13916 & 23-13921*

*Coakley Pendergrass et al. v. Secretary of State of Georgia*,
No. 23-13916; *Annie Lois Grant et al. v. Secretary of State of Georgia*,
No. 24-10241

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

This consolidated brief is submitted on behalf of the Plaintiffs-Appellees in *Pendergrass v. Raffensperger* (No. 23-13916) and *Grant v. Raffensperger* (No. 23-13921).

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees in No. 23-13916 certify that Coakley Pendergrass, Triana Arnold James, Elliott Hennington, Robert Richards, Jens Rueckert, and Ojuan Glaze are individuals and that no publicly held corporation or company has an interest in the outcome of this case.

Plaintiffs-Appellees in No. 23-13921 certify that Annie Lois Grant, Quentin T. Howell, Elroy Tolbert, Triana Arnold James, Eunice Sykes, Elbert Solomon, Dexter Wimbish, Garrett Reynolds, Jacqueline Faye Arbuthnot, Jacquelyn Bush, and Mary Nell Conner are individuals and that no publicly held corporation or company has an interest in the outcome of this case.

Plaintiffs-Appellees in Nos. 23-13916 and 23-13921 further certify that the following have an interest in the outcome of this case:

1.    Albert M. Pearson LLC, *Counsel for Amicus Curiae*

2.    Allensworth, Robert M., *Attempted Amicus Curiae*

3.    Alpha Phi Alpha Fraternity, Inc., *APA Plaintiff*[*]

4.    Adegbile, Debo, *Counsel for APA Plaintiffs*

5.    Allen, De'Ericka, *Counsel for APA Plaintiffs*

6.    American Civil Liberties Union Foundation, Inc., *Counsel for APA Plaintiffs*

7.    Arbuthnot, Jacqueline Faye, *Grant Plaintiff*

8.    Bokat-Lindell, Noah B., *Counsel for Intervenor*

9.    Boone, Robert, *Counsel for APA Plaintiffs*

10.    Bowles, Jasmine, *Amicus Curiae*

11.    Bowen, Brennan, *Counsel for Amicus Curiae*

12.    Boyle, Jr., Donald P., *Counsel for Defendant*

13.    Brown, Phil, *APA Plaintiff*

14.    Brown, Theron, *Former Grant Plaintiff*

15.    Bush, Jacquelyn, *Grant Plaintiff*

16.    Calvo-Friedman, Jennessa, *Former Counsel for APA Plaintiffs*

17.    Carr, Christopher M., *Counsel for Defendant*

18.    Cheung, Ming, *Counsel for APA Plaintiffs*

19.    Common Cause, *Amicus Curiae*

---

[*] Plaintiffs-Appellees in No. 23-13914 are referred to as "APA Plaintiffs." Plaintiffs-Appellees in No. 23-13916 are referred to as "Pendergrass Plaintiffs." Plaintiffs-Appellees in No. 23-13921 are referred to as "Grant Plaintiffs."

20.  Conner, Mary Nell, *Grant Plaintiff*

21.  Crowell & Moring LLP, *Counsel for Amicus Curiae*

22.  Data, Sonika, *Counsel for APA Plaintiffs*

23.  Draper, Paul, *Counsel for Defendant*

24.  Georgia Department of Law, *Counsel for Defendant*

25.  Davis, Alexander S., *Counsel for Amicus Curiae*

26.  Dechert LLP, *Counsel for Amicus Curiae*

27.  DiGiuseppe, Marisa A., *Counsel for APA Plaintiffs*

28.  Dixit, Anuj, *Counsel for APA Plaintiffs*

29.  Douglas, Maura, *Counsel for APA Plaintiffs*

30.  Duffey, Jr., William S., *Former Defendant*

31.  Election Law Clinic at Harvard Law School, *Amicus Curiae*

32.  Elias Law Group LLP, *Counsel for Grant and Pendergrass Plaintiffs*

33.  Fair Districts GA, *Amicus Curiae*

34.  Flynn, Erin H., *Counsel for Intervenor*

35.  Ford, Christina A., *Counsel for Grant and Pendergrass Plaintiffs*

36.  Freeman, Daniel J., *Counsel for Intervenor*

37.  GALEO Latino Community Development Fund, Inc., *Amicus Curiae*

38.  Garabadu, Rahul, *Former Counsel for APA Plaintiffs*

39.  Geaghan-Breiner, Charlotte, *Counsel for APA Plaintiffs*

40.    Geiger, Soren, *Counsel for Amicus Curiae*

41.    Genberg, Jack, *Counsel for Amicus Curiae*

42.    Georgia Coalition for the People's Agenda, *Amicus Curiae*

43.    Georgia State Conference of the NAACP, *Amicus Curiae*

44.    Ghazal, Sara Tindall, *Former Defendant*

45.    Glaze, Ojuan, *Pendergrass Plaintiff*

46.    Glenn, Katie Bailey, *APA Plaintiff*

47.    Grant, Annie Lois, *Grant Plaintiff*

48.    Graves, Cheryl, *Amicus Curiae*

49.    Greenbaum, Jon, *Counsel for Amicus Curiae*

50.    Greenwood, Ruth M., *Counsel for Amicus Curiae*

51.    Hamilton, Kevin J., *Former Counsel for Grant and Pendergrass Plaintiffs*

52.    Harrison, Keith, *Counsel for Amicus Curiae*

53.    Hawley, Jonathan P., *Counsel for Grant and Pendergrass Plaintiffs*

54.    Heard, Bradley E., *Counsel for Amicus Curiae*

55.    Heaven, Astor H.L., *Counsel for Amicus Curiae*

56.    Hennington, Elliott, *Pendergrass Plaintiff*

57.    Hessel, Daniel J., *Counsel for Amicus Curiae*

58.    Houk, Julie M., *Counsel for Amicus Curiae*

59.  Howell, Quentin T., *Grant Plaintiff*

60.  Isaacson, Cory, *Counsel for APA Plaintiffs*

61.  Ivey, Marvis McDaniel, *Amicus Curiae*

62.  Jacoutot, Bryan F., *Counsel for Defendant*

63.  Jackson, Toni Michelle, *Counsel for Amicus Curiae*

64.  James, Triana Arnold, *Grant and Pendergrass Plaintiff*

65.  Jamieson, Nathan, *Counsel for Amicus Curiae*

66.  Johnston, Janice W., *Former Defendant*

67.  Jones, Michael B., *Counsel for Grant and Pendergrass Plaintiffs*

68.  Jones, Steve C., *U.S. District Judge for the Northern District of Georgia*

69.  Kastorf Law LLP, *Counsel for Amicus Curiae*

70.  Kastorf, Kurt, *Counsel for Amicus Curiae*

71.  Khanna, Abha, *Counsel for Grant and Pendergrass Plaintiffs*

72.  Kim, Eliot, *Former Counsel for APA Plaintiffs*

73.  Kim, Taeyoung, *Counsel for APA Plaintiffs*

74.  Krevolin & Horst, LLC, *Counsel for Grant and Pendergrass Plaintiffs*

75.  LaCour, Edmund Gerard, Jr., *Counsel for Amicus Curiae*

76.  Lakin, Sophia Lin, *Counsel for APA Plaintiffs*

77.  LaRoss, Diane F., *Counsel for Defendant*

78. Lawyers' Committee for Civil Rights Under Law, *Counsel for Amicus Curiae*

79. Le, Anh, *Former Defendant*

80. League of Women Voters of Georgia, *Amicus Curiae*

81. Lee, Theresa J., *Counsel for Amicus Curiae*

82. Lewis, Joyce Gist, *Counsel for Grant and Pendergrass Plaintiffs*

83. Lindsey, Edward, *Former Defendant*

84. Love-Olivo, Cassandra Nicole, *Counsel for Amicus Curiae*

85. Mashburn, Matthew, *Former Defendant*

86. May, Caitlyn Felt, *Counsel for APA Plaintiffs*

87. McGowan, Charlene, *Former Counsel for Defendant*

88. Miller, Alex W., *Counsel for APA Plaintiffs*

89. Miller, Kelsey A., *Counsel for APA Plaintiffs*

90. Mitchell, Cassandra, *Counsel for APA Plaintiffs*

91. National Republican Redistricting Trust, *Amicus Curiae*

92. O'Donnell, Courtney, *Counsel for Amicus Curiae*

93. Osher, Daniel C., *Former Counsel for Grant and Pendergrass Plaintiffs*

94. Paradise, Loree Anne, *Former Counsel for Defendant*

95. Pearson, III, Albert Matthews, *Counsel for Amicus Curiae*

96. Pendergrass, Coakley, *Pendergrass Plaintiff*

97. Perkins Coie LLP, *Former Counsel for Grant and Pendergrass Plaintiffs*

98. Perkins, Brianne, *Amicus Curiae*

99. Petrany, Stephen J., *Counsel for Defendant*

100. Raffensperger, Brad, *Defendant*

101. Reynolds, Garrett, *Grant Plaintiff*

102. Richards, Roberts, *Pendergrass Plaintiff*

103. Rollins-Boyd, David, *Counsel for Amicus Curiae*

104. Rosenberg, Ezra D., *Counsel for Amicus Curiae*

105. Rueckert, Jens, *Pendergrass Plaintiff*

106. Ruiz Toro, Juan M., *Counsel for APA Plaintiffs*

107. Rutahindurwa, Makeba, *Counsel for Grant and Pendergrass Plaintiffs*

108. Savitsky, Ari J., *Counsel for APA Plaintiffs*

109. Shaw, Abigail, *Former Counsel for APA Plaintiffs*

110. Sivaram, Anuradha, *Former Counsel for APA Plaintiffs*

111. Sixth District of the African Methodist Episcopal Church, *APA Plaintiff*

112. Solomon, Elbert, *Grant Plaintiff*

113. Southern Poverty Law Center, *Counsel for Amicus Curiae*

114. Sparks, Adam M., *Counsel for Grant and Pendergrass Plaintiffs*

115. Smith, Casey Katherine, *Counsel for APA Plaintiffs*

116.   Steiner, Neil, *Counsel for Amicus Curiae*

117.   Stewart, Janice, *APA Plaintiff*

118.   Stewart, Michael Elliot, *Counsel for Intervenor*

119.   Strickland, Frank B., *Counsel for Defendant*

120.   Sullivan, Rebecca N., *Former Defendant*

121.   Sykes, Eunice, *Grant Plaintiff*

122.   Taylor English Duma LLP, *Counsel for Defendant*

123.   Thomas, Ursula, *Amicus Curiae*

124.   Tolbert, Elroy, *Grant Plaintiff*

125.   Torchinsky, Jason, *Counsel for Amicus Curiae*

126.   Tsai, Denise, *Counsel for APA Plaintiffs*

127.   Tyson, Bryan P., *Counsel for Defendant*

128.   United States of America, *Intervenor*

129.   Varghese, George P., *Counsel for APA Plaintiffs*

130.   Vaughan, Elizabeth Marie Wilson, *Former Counsel for Defendant*

131.   Webb, Bryan K., *Counsel for Defendant*

132.   Weigel, Daniel H., *Counsel for Defendant*

133.   Weitzman, Samuel, *Former Counsel for APA Plaintiffs*

134.   White, Graham, *Former Counsel for Grant and Pendergrass Plaintiffs*

135.   Willard, Russell D., *Counsel for Defendant*

136. Williams, Ayana, *Former Counsel for APA Plaintiffs*

137. Williams, H. Benjamin, *Amicus Curiae*

138. Williams, Edward Henderson, *Counsel for APA Plaintiffs*

139. Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for APA Plaintiffs*

140. Wimbish, Dexter, *Grant Plaintiff*

141. Woods, Eric T., *APA Plaintiff*

142. Young, Sean Jengwei, *Former Counsel for APA Plaintiffs*

143. Zabel, Joseph D., *Former Counsel for APA Plaintiffs*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellees maintain that this appeal can be resolved on the papers based on the state's clear violations of well-established law. Appellees, however, welcome the opportunity to participate in oral argument if the Court determines that oral argument would help facilitate resolution of the appeal.

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................................9

INTRODUCTION ...................................................................................9

STATEMENT OF THE CASE................................................................12

    I.    Standard of Review ...............................................................21

SUMMARY OF THE ARGUMENT .....................................................23

ARGUMENT ........................................................................................26

    I.    The district court did not clearly err in finding that Appellees satisfied *Gingles*'s racially polarized voting inquiry.........................................26

        A.    Section 2 does not require Appellees to prove that racial animosity caused racial bloc voting...........................................26

        B.    Appellees proved vote dilution based on racial bloc voting. ...............................................................37

    II.    The district court did not clearly err in finding that Georgia's political system is not equally open to Black voters. ........................................38

    III.    Section 2 is constitutional. ..................................................42

        A.    Section 2 falls well within Congress's authority to enforce the Fifteenth Amendment. ..............................................42

        B.    Section 2 continues to be a constitutional means of enforcing the Fifteenth Amendment. ..............................................44

        C.    The district court did not clearly err in finding that Georgia's politics were not equally open to Black and white Georgians. .......................................47

    IV.    The district court correctly ruled that Section 2 provides a private right of action. ...........................................................51

        A.    The Supreme Court has interpreted the Voting Rights Act to permit private parties to sue under Section 2............................51

        B.    Application of the *Sandoval* test compels the conclusion that Congress created a private right of action to enforce Section 2.......................................................54

        C.    Statutory stare decisis also weighs in favor of finding a private right of action exists................................................59

CONCLUSION ......................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. State Conf. of NAACP v. Alabama,*
  949 F.3d 647 (11th Cir. 2020) ............................................................52

*Alexander v. Sandoval,*
  532 U.S. 275 (2001).............................................................54, 55, 57

*Allen v. Milligan,*
  599 U.S. 1 (2023).......................................................................*passim*

*Ark. United v. Thurston,*
  626 F. Supp. 3d 1064 (W.D. Ark. 2022) ............................................53

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021)........................................................................59

*Brooks v. Miller,*
  158 F.3d 1230 (11th Cir. 1998) ..........................................................27

*Chisom v. Roemer,*
  501 U.S. 380 (1991)......................................................................33, 60

*City of Boerne v. Flores,*
  521 U.S. 507 (1997)............................................................................42

*City of Carrollton Branch of NAACP v. Stallings,*
  829 F.2d 1547 (11th Cir. 1987) ..........................................................32

*City of Mobile v. Bolden,*
  446 U.S. 55 (1980)..............................................................................60

*City of Rome v. United States,*
  446 U.S. 156 (1980)............................................................................43

*Clarke v. City of Cincinnati,*
  40 F.3d 807 (6th Cir. 1994) ...............................................................36

*Coca v. City of Dodge City*,
  669 F. Supp. 3d 1131 (D. Kan. 2023)...................................................53

*Fitzgerald v. Barnstable Sch. Comm.*,
  555 U.S. 246 (2009)...........................................................................57

*Ford v. Strange*,
  580 Fed. App'x 701 (11th Cir. 2014) ................................................53

*Friends of Everglades v. S. Fla. Water Mgmt. Dist.*,
  570 F.3d 1210 (11th Cir. 2009) .........................................................53

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
  775 F.3d 1336 (11th Cir. 2015) .........................................................39

*Ga. State Conf. of NAACP v. Georgia*,
  No. 1:21-CV-05338, 2023 WL 7093025 (N.D. Ga. Oct. 26, 2023)...................53

*Ga. State Conf. of NAACP v. Georgia*,
  No. 1:21-cv-5338, 2022 WL 18780945 (N.D. Ga. Sept. 26, 2022) ...................56

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002)...........................................................................54

*Goosby v. Town Bd. of Town of Hempstead*,
  180 F.3d 476 (2d Cir. 1999) ..............................................................36

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
  992 F.3d 1299 (2021).........................................................................46

*Halliburton Co v. Erica P. John Fund*,
  573 U.S. 258 (2014)...........................................................................59

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166 (2023)...........................................................................55

*Hous. Laws.' Assoc. v. Att'y Gen. of Tex.*,
  501 U.S. 419 (1991)...........................................................................60

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)...........................................................................57

*John R. Sand & Gravel Co. v. United States*,
    552 U.S. 130 (2008)............................................................................59

*Johnson v. De Grandy*,
    512 U.S. 997 (1994)...............................................................30, 34, 38

*Johnson v. Hamrick*,
    296 F.3d 1065 (11th Cir. 2002) ................................................*passim*

*Kimble v. Marvel Ent., LLC*,
    576 U.S. 446 (2015)...............................................................25, 59, 60

*Lewis v. Alamance County*,
    99 F.3d 600 (4th Cir. 1996) ...............................................................33

*Lopez v. Abbott*,
    339 F. Supp. 3d 589 (S.D. Tex. 2018)...............................................36

*LULAC Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) .............................................................34

*LULAC v. Perry*,
    548 U.S. 399 (2006)..................................................................*passim*

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985)...........................................................................58

*Mich. Welfare Rights Org. v. Trump*,
    600 F. Supp. 3d 85 (D.D.C. 2022).....................................................53

*Mixon v. Ohio*,
    193 F.3d 389 (6th Cir. 1999) .............................................................53

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996)..................................................25, 52, 55, 56

*Nat'l Ass'n of the Deaf v. Florida*,
    980 F.3d 763 (11th Cir. 2020) ...........................................................47

*Negron v. City of Miami Beach*,
    113 F.3d 1563 (11th Cir. 1997) .........................................................22

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) ................................................................32

*Perry v. Perez*,
    565 U.S. 388 (2012)................................................................................60

*Perry-Bey v. City of Norfolk*,
    678 F. Supp. 2d 348 (E.D. Va. 2009) ...................................................54

*Robinson v. Ardoin*,
    86 F.4th 574 (5th Cir. 2023) ................................................................53

*Sanchez v. Colorado*,
    97 F.3d 1303 (10th Cir. 1996) ........................................................32, 35

*Schwab v. Crosby*,
    451 F.3d 1308 (11th Cir. 2006) ...........................................................52

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ......................................................57, 58

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996)................................................................................52

*Shelby County v. Holder*,
    43 F. Supp. 3d 47 (D.D.C. 2014)........................................................56

*Shelby County v. Holder*,
    570 U.S. 529 (2013).......................................................................*passim*

*Shelby County v. Lynch*,
    799 F.3d 1173 (D.C. Cir. 2015)...........................................................56

*Shepard v. United States*,
    544 U.S. 13 (2005)................................................................................59

*Singleton v. Merrill*,
    582 F. Supp. 3d 924 (N.D. Ala. 2022)..............................24, 34, 39, 51

*Solomon v. Liberty Cnty. Comm'rs*,
    221 F.3d 1218 (11th Cir. 2000) ...........................................................32

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966)..................................................................43

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
  600 U.S. 181 (2023)............................................................25, 46

*Thornburg v. Gingles*,
  478 U.S. 30 (1986)...........................................................*passim*

*United States v. Charleston County*,
  365 F.3d 341 (4th Cir. 2004) ...................................................35

*United States v. Marengo Cnty. Comm'n*,
  731 F.2d 1546 (11th Cir. 1984) ...............................................32

*Uno v. City of Holyoke*,
  72 F.3d 973 (1st Cir. 1995)......................................................36

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ...................................................46

*Veasey v. Perry*,
  29 F. Supp. 3d 896 (S.D. Tex. 2014).........................................53

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................40

*Vote.org v. Callanen*,
  89 F.4th 459 (5th Cir. 2023) ...................................................57

*Watson v. United States*,
  552 U.S. 74 (2007)..................................................................60

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
  979 F.3d 1282 (11th Cir. 2020) ...........................................*passim*

**Statutes**

52 U.S.C. § 10301(a) ...................................................................9, 54

52 U.S.C. §10302(a) .........................................................25, 55, 59

52 U.S.C. § 10308(f)....................................................................57

52 U.S.C. § 10310(e) ..............................................................................25, 56

**Other Authorities**

S. Rep. 94-295, 1975 U.S.C.C.A.N. 774 (1975) ...............................................56, 60

U.S. Const. art. II § 1, cl. 5 .......................................................................28

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly determined that plaintiffs need not prove the cause of racially polarized voting to satisfy the third *Gingles* precondition and establish a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a).

2.      Whether the district court committed clear error in concluding that the totality of circumstances weighed in favor of finding that Georgia's 2021 congressional, state senate, and state house redistricting plans violated Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a).

3.      Whether Section 2 is constitutional.

4.      Whether Section 2 confers a private right of action.

## INTRODUCTION

Just last term, redistricting defendants in this Circuit took a swing at *Thornburg v. Gingles*, 478 U.S. 30 (1986), which for nearly 40 years has provided the framework for adjudicating vote dilution cases brought under Section 2 of the Voting Rights Act. The Supreme Court rejected that attack, chastising "Alabama's attempt to remake our § 2 jurisprudence anew." *Allen v. Milligan*, 599 U.S. 1, 23 (2023). The ink on that opinion has barely dried, and yet Georgia's Secretary of State is already rerunning Alabama's failed strategy of demanding a brand-new legal standard for Section 2 claims. Specifically, he wants this Court to rewrite *Gingles*'s inquiry into racially polarized voting and require, for the first time, that plaintiffs

9

prove the subjective intent of white voters. This "new approach to § 2," however, is "compelling neither in theory nor in practice." *Id.* at 24.

The *Gingles* inquiry into racially polarized voting is simple and objective: It asks whether the minority group votes cohesively in one direction, and whether the minority's preferred candidates are thwarted by cohesive voting by white voters in the opposite direction. *Allen*, 599 U.S. at 18–19. There is no dispute that this is the case in Georgia, which should end the inquiry. Yet the Secretary presses an additional requirement that is more nebulous and enigmatic: He would have plaintiffs prove the content of voters' character and show, somehow, that the white majority is infected with racial animosity to a degree sufficient to explain the divergence in racial voting patterns. This approach ignores the substance of the Section 2 injury, which is not personal ill-will but structural electoral inequality. And it contradicts "the hard-fought compromise that Congress struck" to *eliminate* any requirement that plaintiffs prove discriminatory intent. *Id.* at 25.

The Secretary's other legal arguments are similarly foreclosed. For one, Section 2 is not unconstitutional. The Supreme Court held as much in *Allen*, and it did not silently reverse that holding three weeks later in an unrelated college admissions case. And Section 2 provides a private right of action, as is clear from the statute's text and structure and decades of judicial decisions, including from this Court and the Supreme Court.

With the law squarely against him, the Secretary is left to quibble with the district court's factual findings related to the totality-of-circumstances inquiry. This critique gains no traction in the evidence and dead ends at the standard of review. This Court owes "considerable deference" to the district court's factual findings, *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002), including to its "finding that different pieces of evidence carry different probative values in the overall section 2 investigation," *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020). This deference "preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." *Gingles*, 478 U.S. at 79. Thus, the force of the Secretary's argument is even less than the sum of its parts. Even if the Secretary could rebalance the evidence related to the few factors that he contests, that still would not justify disturbing the district court's ultimate conclusion that the *totality* of circumstances—reflecting the district court's prerogatives to weigh the various factors as it saw fit—confirmed a violation of Section 2.

This Court should affirm.

## STATEMENT OF THE CASE

All of Georgia's population growth from 2010 to 2020 is attributable to growth in the minority population. Doc. 286 at 33.[1] Although Georgia's total population increased by over one million people during this period, Georgia's non-Hispanic white population actually *decreased* by 51,764, or approximately 1%. *Id.* The any-part ("AP") Black population, by contrast, increased by 484,048, accounting for nearly half of Georgia's total population growth. *Id.* at 34. As of 2020, white Georgians maintain a "razor thin" majority of the state's population at 50.06%, while Black Georgians comprise more than one-third (33.03%). *Id.* As of 2020, Black Georgians make up 31.73% of the voting-age population in Georgia. Doc. 174-1 ¶ 18 & fig. 2. White Georgians, meanwhile, comprise 52.82% of the voting-age population in the state. *Id.* ¶ 18 & fig. 2.

In the Atlanta Metropolitan Statistical Area ("Metro Atlanta"), the magnitude by which Black population growth outpaced white population growth is even greater. From 2010 to 2020, the AP Black population accounted for 51.04% of Metro Atlanta's population growth. Doc. 286 at 35. During the same period, the white population in Metro Atlanta declined by 22,736. Doc. 174-1 at ¶ 30 & fig. 5. As of

---

[1] While this consolidated brief is submitted on behalf of the Plaintiffs-Appellees in *Pendergrass v. Raffensperger* (No. 23-13916) and *Grant v. Raffensperger* (No. 23-13921), all record citations are to documents filed in *Pendergrass v. Raffensperger*, No. 1:21-cv-05339 (N.D. Ga.) except where otherwise noted.

2020, Black Georgians make up 35.91% of the total population and 34.86% of the voting-age population in Metro Atlanta. Doc. 286 at 35. White Georgians, meanwhile, comprise 43.71% of the total population and 46.34% of the voting-age population in the region. Doc. 174-1 ¶ 27 & figs. 5&6.

On December 30, 2021, Georgia enacted new congressional (SB 2 EX), state senate (SB 1 EX), and state house (HB 1 EX) maps into law. Doc. 97 at 14. Shortly thereafter, Plaintiffs-Appellees—Black Georgian voters—filed these consolidated lawsuits and moved for a preliminary injunction, challenging each of the new plans as violations of Section 2 of the Voting Rights Act. *See* Doc. 1 at 8, 28–29. Specifically, the *Pendergrass* Plaintiffs challenged the congressional plan, and the *Grant* Plaintiffs challenged the state senate and state house plans.[2] The district court subsequently held a six-day preliminary injunction hearing. Doc. 286 at 16, 514–16.

On February 28, 2022, the district court issued an order in which it found that Plaintiffs satisfied their burden under the well-established *Gingles* standard for adjudicating Section 2 vote dilution claims. Doc. 97 at 220. But the court denied relief after weighing the equities, concluding that, as of the date of its order, "there [wa]s insufficient time to effectuate remedial relief for purposes of the 2022 election

---

[2] A separate case brought by Alpha Phi Alpha Fraternity, Inc. and other plaintiffs also challenged the state legislative plans. The district court entered a coordinated order finding in favor of all three plaintiff groups. Doc. 286. The three appeals from that order, *Alpha Phi Alpha*, *Pendergrass*, and *Grant*, have been consolidated.

cycle." *Id.* at 23–27, 231–37 (citing *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring)).

Following discovery, the parties filed cross-motions for summary judgment. While those motions were pending, the Supreme Court issued its decision in *Allen* reaffirming the *Gingles* standard for Section 2 claims. Doc. 286 at 18–19. Finding material issues of fact to be in dispute, the district court denied Plaintiffs' summary judgment motions. Doc. 215 at 2. It also rejected the Secretary's legal arguments that the third *Gingles* precondition requires proof that race rather than partisanship explains racially polarized voting and that Section 2 is unconstitutional as applied. *Id.* at 49–65.

On September 5, 2023, the district court held an eight-day bench trial in which it heard from 20 witnesses who presented live testimony and 22 who testified via deposition. Doc. 286 at 20. On October 26, 2023, the district court issued its final order, granting judgment for Plaintiffs in all three consolidated cases.

***Gingles One.*** After reviewing extensive testimony from fact witnesses and Plaintiffs' expert witnesses, whom the district court found qualified and highly credible, the district court found that Plaintiffs satisfied the first *Gingles* precondition as to each of the three plans. Doc. 286 at 272–274, 405–07. As to the congressional plan (*Pendergrass*), the court found that Plaintiffs had established that the Black population in the Western Atlanta metropolitan area is sufficiently large and

14

geographically compact to constitute a majority in an additional congressional district, *id.* at 173, noting that the illustrative plan "me[t] or exceed[ed] the Enacted Congressional Plan on all empirical measures," *id.* at 200–01. As to the state legislative plans (*Grant*), the court found that the Black community was sufficiently large and geographically compact to constitute two additional state senate districts in the Atlanta metropolitan area and four state house districts in the Atlanta metropolitan area and Georgia's Black Belt. *Id.* at 492.[3]

**Gingles Two and Three.** The district court also found that, as to both the congressional (*Pendergrass*) and state legislative (*Grant*) challenges, Plaintiffs satisfied the second and third *Gingles* preconditions. Doc. 286 at 201–09, 413–17, 420–26. The district court found that Plaintiffs satisfied the second *Gingles* precondition because—as the parties stipulated—Black voters are "extremely" politically cohesive, *id.* at 203–04, on average supporting their candidates of choice with 98.4% of the vote, *id.* at 201–205, 413–17. The district court found that Plaintiffs satisfied the third *Gingles* precondition because—as the parties again stipulated—white voters are highly cohesive and vote as a bloc to defeat Black-preferred candidates, *id.* at 205–209, 417–26, noting that the evidence of white bloc voting against Black-preferred candidates was even stronger than what the Supreme

---

[3] The *Alpha Phi Alpha* and *Grant* Plaintiffs satisfied *Gingles* One as to a total of five state house districts. *Id.* at 509 & n.136.

15

Court had deemed to be sufficient to establish a Section 2 violation in *Allen*, *id.* at 207–08.

In finding that Plaintiffs satisfied the second and third *Gingles* preconditions, the district court relied upon expert testimony from Dr. Maxwell Palmer, a political scientist with extensive experience in redistricting litigation, who established that voting is racially polarized in the areas where Plaintiffs alleged Section 2 violations. The district court deemed Dr. Palmer to be "highly credible" and found his testimony "extremely helpful." Doc. 286 at 73.

***Totality of the circumstances.*** After carefully reviewing the record, the district court concluded that the totality of circumstances weighed in favor of finding that the congressional, state senate, and state house plans violated Section 2, finding that "the political process is not currently *equally* open to Black Georgians" because "Black voters still suffer from *less* opportunity to partake in the political process than white voters." *Id.* at 211. In reaching this conclusion, the district court found that Senate factors 1, 2, 3, 5, 6, and 7 all weighed in Plaintiffs' favor. *Id.* at 273, 492–93.

<u>*Senate factors 1 and 3.*</u> The first Senate factor considers the history of official voting-related discrimination in the state, while the third considers the extent to which the state has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group. *Id.* at 213–14. The district

16

court found "there is significant overlap in the trial evidence for the two factors" and accordingly considered them together. *Id.* at 213 n.48.

The Secretary did not dispute that Georgia has a long history of imposing voting-related discrimination against its Black citizens. Instead, he challenged that discrimination as outdated or illusory. *See* Br. 50–51. But the district court's review of the record found otherwise. First, the district court explained that it "assess[ed] both past *and present* efforts that have caused a disproportionate impact on Black voters." *Id.* at 214 (emphasis in original). As to the more distant history, the district court acknowledged the Secretary's stipulation that "'up until 1990 [Georgia] had historical discrimination.'" *Id.* at 217 (quoting Tr. 1524:14–15). And it credited Dr. Orville Burton's unrebutted testimony, which the court found "highly credible," and to which it assigned "great weight," that "throughout the history of the state of Georgia, voting rights have followed a pattern where after periods of increased nonwhite voter registration and turnout, the state has passed legislation, and often used extralegal means, to disenfranchise minority voters." *Id.* at 157–58, 216–17 (citing Doc. 174-5 at 10 and Tr. 1428:3–24).

The district court focused particularly on Dr. Burton's testimony about more *recent* discriminatory practices, including polling place closures (which have disproportionately occurred in majority-Black precincts), voter purges (which have disproportionately removed Black voters from the rolls), and voter registration

procedures that resulted in the unnecessary rejection of voter registration forms (which disproportionately prevented Black applicants from registering). *Id.* at 217–32. The Secretary did not introduce a rebuttal expert to challenge Dr. Burton's conclusions. *Id.* at 230. Instead, the Secretary argued that these more recent practices were not discriminatory because some of them had been challenged in unrelated litigation and found to be lawful. *See id.* at 230–31. The district court concluded, however, that it was "not inconsistent with these prior rulings to now find that these voting practices have a discriminatory impact on Black voters for purposes of the . . . totality of the circumstances" analysis. *Id.*

*Senate factor 2.* The second Senate factor considers the extent to which voting in the state is racially polarized. The district court found that this factor, too, weighed "heavily" in favor of finding a Section 2 violation. *Id.* at 233–242, 486–89. The Secretary did not dispute Plaintiffs' evidence that voting in Georgia is racially polarized; his expert, Dr. Alford, even conceded that the "stability" of racially polarized voting across time, office, and geography in Georgia was "remarkable." Doc. 174-8 at 3; *see* Tr. 2251:18–22. Instead, the Secretary argued that the polarization was attributable to partisanship rather than race. Doc. 286 at 234. But the district court rejected that argument because the record contained insufficient evidence to show that "partisanship is the moving force behind a Black voter's choice of candidate." *Id.* at 241. And the district court credited Dr. Burton's

testimony that partisanship, including the parties' positions on race-related issues, is itself a function of race,. *See id.* (citing Tr. 1444:23–1448:21).

*Senate factor 5.* The fifth Senate factor considers the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. *Id.* at 242–43. In concluding that this factor, too, supported finding a Section 2 violation, the district court credited testimony from Dr. Loren Collingwood, an expert the court found "highly credible" and whose testimony it assigned "great weight." *Id.* at 159. Dr. Collingwood established the extensive and persistent evidence of socioeconomic disparities between Black and white Georgians. *Id.* at 248–49. Among other things, the unemployment rate of Black Georgians is nearly double that of white Georgians, *id.*; Black Georgians are more likely to live below the poverty line and to receive public benefits, *id.*; Black Georgians are more likely to lack a high school diploma or a higher educational degree, *id.*; and Black Georgians are more likely to lack health insurance, *id.* at 249. As a result of these disparities, Black Georgians are less likely than white Georgians to participate in elections. *See id.* at 250 n.61. The Secretary did not meaningfully contest any of this evidence, nor did he provide any rebuttal evidence contesting that Georgia's elections suffer from statistically significant lower Black voter turnout when compared to their white counterparts. *Id.* at 249.

*Senate factor 6*. The sixth Senate factor concerns racial appeals in political campaigns. The district court identified evidence of racial appeals in several recent Georgia campaigns, but it did not afford this factor great weight because of the difficulty in evaluating the frequency of such appeals. *Id.* at 251–52.

*Senate factor 7*. The seventh Senate factor considers the extent to which members of the minority group have been elected to public office in the jurisdiction. *Id.* at 252. As the district court found, very few Black Georgians have been elected to statewide office. *Id.* at 252–58 (relying on judicially noticed and stipulated facts). Georgia has never had a Black governor and has had only one Black U.S. Senator— Senator Raphael Warnock—who was elected after 230 years of exclusively white Senators. *Id.* Only four Black officials have been elected to statewide partisan office in Georgia since Reconstruction, *id.* at 257, and only 12 Black people have been elected to Congress from Georgia, *id.* at 254. Of the five Black elected officials currently serving in the U.S. House of Representatives, four were elected from majority-Black districts and the fifth from a majority-minority district. *Id.* at 254– 55. In the 2020 legislative elections, Black candidates had no success, with one exception, unless they were running in majority-Black districts. *Id.* at 255.

The district court found Senate factor 7 weighed in Plaintiffs' favor, noting that the "isolated successes of Black candidates" demonstrates that Black Georgians are underrepresented in elected office. *Id.* at 257.

20

_Senate factors 4, 8, and 9._ The district court found that the remaining Senate factors were irrelevant or otherwise due little weight. _See id._ at 242 n.57, 259–60, 273 n.74, 262 n.69.

*    *    *

Upon finding that the congressional, state senate, and state house plans violated Section 2, the district court rejected each of the Secretary's affirmative defenses, including arguments that Section 2 is unconstitutional and that it lacks a private right of action. _Id._ at 506–08. The court permanently enjoined the Secretary from carrying out elections under the enacted plans. _Id._ at 514.

On November 22, 2023, the Secretary noticed his appeals. _See_ Doc. 302.

## I.    Standard of Review

This Court's "review of a district court's finding of vote dilution under section 2 is only for clear error." _Wright_, 979 F.3d at 1301. "Under this standard, a finding of fact is clearly erroneous only 'if the record lacks substantial evidence to support it.'" _Johnson_, 296 F.3d at 1074 (quoting _Lightning v. Roadway Express, Inc.,_ 60 F.3d 1551, 1558 (11th Cir. 1995)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." _Wright_, 979 F.3d at 1301 (quotation marks omitted). Thus, unless the Court is "compelled to conclude that the district court's findings are not supported by substantial evidence, [it] must affirm." _Johnson_, 296 F.3d at 1074.

The Court's application of "[t]he clearly-erroneous standard extends not only to the district court's ultimate conclusion of vote dilution, but also to its 'finding that different pieces of evidence carry different probative values in the overall section 2 investigation.'" *Wright*, 979 F.3d at 1301 (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000)). "Deference is afforded the district court's findings due to its special vantage point and ability to conduct an intensely local appraisal of the design and impact of a voting system." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997) (quotation marks omitted). Applying the deferential clearly erroneous standard "'to ultimate findings of vote dilution" thus "preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law.'" *Wright*, 979 F.3d at 1301 (quoting *Gingles*, 478 U.S. at 79).

The "considerable deference" this Court gives to the district court's finding of vote dilution, *Johnson*, 296 F.3d at 1074, does not "inhibit [its] 'power to correct errors of law,'" which are reviewed de novo, *Wright*, 979 F.3d at 1301 (quoting *Solomon*, 221 F.3d at 1227). "But when the district court's understanding of the law is correct, when the record indicates that the court engaged in a searching and meaningful evaluation of all the relevant evidence, and when there is ample evidence in the record to support the court's conclusions," this Court's "review is at an end." *Wright*, 979 F.3d at 1301–02 (cleaned up).

22

## SUMMARY OF THE ARGUMENT

**I.** The Secretary's principal argument, that Section 2 plaintiffs must prove not merely the *existence* of racially polarized voting but also the *cause* of racially polarized voting to satisfy the third *Gingles* precondition, is wrong. The district court correctly determined that inquiries into the personal motivations of independent actors—of map-drawers, of legislators, and of voters—have no place in the *Gingles* analysis. Section 2 explicitly prescribes an effects test, and wherever the *effect* of a districting map is to deny a large and compact minority population equal electoral opportunities, in significant part because of the *effects* of racial bloc voting, no proof of racial animus is required. *See Allen*, 599 U.S. at 25.

The Secretary's preferred test is incoherent and incompatible with binding precedent. The Secretary attempts to build a slippery slope on fears that cohesive minority voting could require majority-minority districts "virtually anywhere," Appellant's Brief ("Br.") at 26, *Pendergrass*, No. 23-13916 (11th Cir. Feb. 7, 2024), Doc. 26, but there is nowhere to slide from *Gingles*'s flat terrain. Section 2 plaintiffs must prove additional preconditions other than cohesive minority voting, *see Gingles*, 478 U.S. at 50–51, which significantly restricts the statute's application. From *Gingles* to *Allen*, courts have consistently rejected the notion that Section 2's prohibition against election-related policies that discriminate "on account of race"

23

requires plaintiffs to prove intentional racial discrimination. *See Allen*, 599 U.S. at 25 (citing *Gingles*, 478 U.S. at 71, n.34).

In any event, the record resolves this dispute in Appellees' favor. The statistical showing of racially polarized voting endorsed by the district court was irrefutable (and uncontested here), and the Secretary failed to introduce any evidence that purportedly race-blind partisanship can explain the divergent voting patterns of Black and white Georgians.

**II.** The Secretary's attack on the district court's totality-of-circumstances analysis fares no better. He faults the court for considering multiple Senate factors together, but that is ordinary and insignificant. *See, e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1020 (N.D. Ala. 2022), *aff'd sub nom. Allen*, 599 U.S. 1. And he deprecates the substance of the district court's analysis, advancing additional purported requirements that have no grounding in precedent or are otherwise unsupported by the record. The Secretary's litany of minor, unsubstantiated complaints fails to establish the clear error necessary for reversal.

**III.** The Secretary's brazen attack on Section 2's constitutionality also fails. Just last year, *Allen* rejected "arguments that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." 599 U.S. at 41. This conclusion is not contradicted (let alone somehow reversed) by *Shelby County v. Holder*, 570 U.S. 529 (2013), a case addressing federalism concerns unique to a regime that singled

24

out targeted jurisdictions for preclearance obligations, nor by *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023), a case addressing university admissions programs that alluded to redistricting only in passing to *endorse* Section 2's requirements, *see id.* at 207. Even indulging the Secretary's questionable premise that statutes may lose the force of law if they are not updated to reflect contemporary events, the *Gingles* test pegs Section 2's enforcement to present-day circumstances, including residential segregation and polarized voting, that will naturally sunset successful vote dilution litigation if and when such racial divisions are overcome. *See Allen*, 599 U.S. at 28–29.

**IV.** Finally, the Secretary contends that private plaintiffs may not enforce Section 2, but this is an argument that courts have rejected time and again. *See, e.g.*, *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996). Section 2 recognizes that relief may be sought by "the Attorney General *or an aggrieved person*," 52 U.S.C. §10302(a) (emphasis added), and it authorizes attorneys' fees to "the prevailing party, *other than the United States*," *id.* § 10310(e) (emphasis added). Provisions like these necessarily allude to private as well as government enforcement. And because Congress has acquiesced to decades of private Section 2 litigation, there is no basis for this Court to upend settled expectations now. *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015).

The Court should affirm.

## ARGUMENT

The Secretary does not dispute that Appellees identified a Black community that is sufficiently large and compact to constitute a majority in additional reasonably configured districts, that Black voters are politically cohesive, or that white voters vote sufficiently as a block to defeat Black voters' preferred candidates. Unable to challenge any of the *Gingles* preconditions on the facts, the Secretary concocts a new test untethered to binding precedent. The Secretary's challenge to the district court's totality-of-circumstances analysis, in turn, is unable to overcome substantial record evidence and the deference owed the district court's findings. And the Secretary's arguments against Section 2's constitutionality and private right of action are simply wrong.

## I.    The district court did not clearly err in finding that Appellees satisfied *Gingles*'s racially polarized voting inquiry.

The district court correctly determined that Appellees satisfied the second and third *Gingles* preconditions. The Secretary does not dispute the evidence presented. Instead, the Secretary tries to impose an intent requirement where none exists in the law. But even if Appellees had to provide evidence that race caused the polarized voting patterns in Georgia, they have done so.

### A.    Section 2 does not require Appellees to prove that racial animosity caused racial bloc voting.

26

Under the well-established *Gingles* framework, Appellees must prove that the minority group is politically cohesive and "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. As the *Gingles* plurality concluded, "*the reasons* [B]lack and white voters vote differently have *no relevance* to the central inquiry of § 2. By contrast, the correlation between [the] race of voters and the selection of certain candidates is crucial to that inquiry." *Id.* at 63 (emphasis added). This Circuit has properly applied the Supreme Court's directive that the second and third *Gingles* preconditions "ask whether voting is racially polarized and, if so, whether the white majority is usually able to defeat the minority bloc's candidates" without requiring plaintiffs to prove *why* Black and white voters vote differently. *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998).

1.    *The Secretary misunderstands Section 2.*

The Secretary's preferred rule—that there is no racial bloc voting where "voting patterns are readily explained by race-neutral partisan politics," Br. 21—is an incoherent vortex of semantic tail-chasing. Political parties are simply the organizing vehicles that voters with shared political goals use to mobilize for political power. Where political parties themselves are largely segregated by race, then partisan politics are, tautologically, not race-neutral. The Secretary's approach would limit Section 2 claims to instances where Black and white voters are sorted

randomly between the two major parties, but then vote with members of their race rather than with members of their party. That would be *irrational*—the purpose of a political party is for people who vote alike to come together to advance their shared goals, and people who vote alike sort themselves into respective parties. *See, e.g.*, *Gingles*, 478 U.S. at 56 (examining whether Black voters are "*politically* cohesive"). Black voters do not forfeit Section 2's protections when they mobilize to pursue unique goals and interests under a common party banner. *See Allen*, 599 U.S. at 18.

The Supreme Court has repeated *Gingles*'s straightforward framework for decades, *see id.*, and yet the Secretary completely misunderstands it. He fears that "districts with Republican majorities would violate § 2 simply because the majority (regardless of racial composition) has a different ideological preference than a black minority." Br. 25–26. This formulation seizes on the second *Gingles* precondition (cohesive Black voting), completely ignores the other two preconditions, and then complains that the framework *the Secretary denuded* is absurd and insufficient.[4] While the Secretary blithely conflates Geogia's white majority with all non-Black voters, the Supreme Court has never done so. The third precondition asks whether "the *white majority* votes sufficiently as a bloc" to defeat the minority's preferred

---

[4] The Secretary's move is akin to blasting the Constitution's preconditions for presidential candidates—who must be a natural born citizen, at least 35 years old, and a U.S. resident for at least 14 years, U.S. Const. art. II § 1, cl. 5—on the grounds that it could elevate a 40-year-old foreign national who has never been to the United States.

candidate, *Allen*, 599 U.S. at 18, attributing explicit relevance to the majority's racial composition.

The Secretary further warns that "[v]irtually anywhere that a racial minority votes cohesively, § 2 would demand separate majority-minority districts." Br. 26. That is true only if "virtually anywhere" means "only in the rare instances where the minority group is sufficiently large and compact to constitute a majority in a reasonably configured district and satisfies the third precondition and the totality of circumstances."[5] Hearing the Secretary tell it, an observer unfamiliar with American law and politics might reasonably expect that, because racial minorities often vote cohesively, every political district in America is a majority-minority district due to Section 2's commands. To put it mildly, this is completely off-base.

The Secretary's fear that Section 2 systemically disadvantages the Republican Party reveals another fundamental misconception of the statute's purpose and application. The problem that Section 2 redresses in the vote dilution context is not that white voters vote differently than Black voters, or even that white-preferred Republican candidates defeat Black-preferred Democratic candidates. The problem is that a Black-preferred candidate *could win* in a given area *but for* the chosen

---

[5] The Secretary commits a similar error when he mischaracterizes Section 2 as "Congress['s demand] that Georgia and other states racially segregate their voters," Br. 43, which ignores that *Gingles*'s first precondition necessarily limits Section 2's application to areas where voters are *already* racially segregated. *See Allen*, 599 U.S. at 28–29.

29

placement of district lines, resulting in vote dilution. *See LULAC v. Perry*, 548 U.S. 399, 433 (2006). As long as officials elected by white majorities can rely on dilutive redistricting schemes as a substitute for courting Black support to win office, the interests of Black voters are condemned to echo in the void. Section 2 ensures that when Black voters are sufficiently numerous in a specific geographic location, they have a meaningful opportunity to "pull, haul, and trade" their way to political power. *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994). This, in turn, gives candidates the electoral incentive to champion Black voters' unique interests and *be* their candidate of choice. . Under lawful maps, Democrats and Republicans should have equal incentive to add to their coalition by winning Black voters to their tent. The Secretary's approach, in contrast, manipulates and distorts the electoral playing field by guaranteeing that white-preferred candidates can remain in power, without ever having to solicit a Black vote, by drawing lines that exploit racially polarized voting.

## 2.    *The Secretary misreads the relevant caselaw.*

No court—not the Supreme Court, not this Court, and not even out-of-circuit precedent—has required plaintiffs to prove that "racial animosity" is responsible for racially polarized voting. *Contra* Br. 31. The Secretary's contrary argument begins by misreading *Gingles* to claim that a majority of justices in that case agreed that the cause of the racial polarization was a necessary predicate to finding a Section 2 violation. Br. 43–45. But as the district court correctly found, Justice White was the

"only Justice to suggest that the Court should consider the race of the candidates in addition to the race of the voter at the precondition phase to show the causes of the polarization." Doc. 215 at 51. Even then, a close reading of Justice White's *Gingles* concurrence demonstrates that his position is entirely consistent with the binding definition of racially polarized voting. While Justice White disagreed with the *Gingles* plurality's position that causation is *never* relevant to the racially polarized voting analysis, he did not suggest it is *always* relevant. To the contrary, Justice White acknowledged that, "on the facts of [that] case," there was "*no need*" to analyze causation. *Gingles*, 478 U.S. at 83 (White, J., concurring) (emphasis added).[6] And while the Secretary contends that "Section 2's text explicitly requires racial causation because it applies only to injury 'on account of race or color,'" Br. 21 (quoting 52 U.S.C. § 10301(a)) (emphasis omitted), *Allen* explicitly adopted the *Gingles* plurality's narrower construction of that phrase. "[I]t is patently clear," the Court repeated, "that Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required

---

[6] Justice O'Connor, writing on behalf four justices, confirmed the plurality's determination that evidence relevant to the second and third *Gingles* factors cannot be rebutted "by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters." *Id*. at 100 (O'Connor, J., concurring). Like Justice White, Justice O'Connor merely observed that such evidence *could at times* be relevant to the "overall vote dilution inquiry." *Id.*

purpose of racial discrimination." *Allen*, 599 U.S. at 25 (quoting *Gingles*, 478 U.S. at 71, n.34).

In line with Supreme Court precedent, this Court, too, has never required plaintiffs to either prove that race was the cause of the second and third *Gingles* preconditions or disprove that partisanship or other reasons could account for the polarization. *See City of Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1556 (11th Cir. 1987) (reversing district court's insistence that a Section 2 plaintiff "indicate that race was an overriding or primary consideration in the election of a candidate"); *see also Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994)[7]; *Solomon*, 221 F.3d at 1225; *Wright*, 979 F.3d at 1304.

This makes sense for two reasons. First, as this Circuit has explained, satisfaction of the *Gingles* preconditions creates an inference of racial bias, since "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984); *see also Sanchez v. Colorado*, 97 F.3d 1303, 1310 (10th Cir. 1996) (*Gingles*

---

[7] *Nipper*, which the Secretary also cites, Br. 27, explicitly noted that "[p]roof of the second and third *Gingles* factors—demonstrating racially polarized bloc voting that enables the white majority usually to defeat the minority's preferred candidate—is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process." 39 F.3d at 1524. And the Court emphasized that evidence of racial bias or the reason behind polarized voting belongs in the totality-of-circumstances inquiry. *Id.* at 1524–26 (noting courts may allow "a defendant to rebut proof of vote dilution by showing that losses by minority-preferred candidates are attributable to non-racial causes").

preconditions "create[] the inference the challenged practice is discriminatory"). Were plaintiffs required to prove racial bias at the outset, Section 2 jurisprudence would morph into an intent-based claim. But "Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also Gingles*, 478 U.S. at 70–71 ("[W]e reject the suggestion that racially polarized voting refers only to white bloc voting which is caused by white voters' *racial hostility* toward black candidates." (emphasis in original)). The Supreme Court just last year reaffirmed that Section 2 is an effects test. *Allen*, 599 U.S. at 25.

Second, if the *Gingles* preconditions imposed a causation requirement, that would render the second Senate factor superfluous. Hence, courts have inquired into the potential causes of racial polarization under the totality-of-circumstances without examining causation at the preconditions phase. *See Lewis v. Alamance County*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) ("We think the best reading of the several opinions in *Gingles* . . . is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions but relevant in the totality of circumstances inquiry." (citations omitted)). In *Allen*, for example, the Supreme Court affirmed the district court's conclusion that the plaintiffs carried their burden at the totality of circumstances stage by demonstrating, among other things, "that elections in Alabama were racially polarized." 599 U.S. at 22. The lower court entertained

Alabama's argument that the stark racially polarized voting was "attributable to politics rather than race" in evaluating the second Senate factor. *Singleton*, 582 F. Supp. 3d at 1018. So too here.

The Secretary suggests that racial bloc voting does not exist where white voters "support[] white and [B]lack candidates at identical rates." Br. 16. But this Circuit has squarely rejected such a theory, instead confirming that the focus of the inquiry is on the race of the voter, not the candidate. In *Johnson*, the Court noted that while district courts do not necessarily commit clear error by giving greater weight to elections featuring candidates of different races, "there is no requirement that a district court must do so." 296 F.3d at 1078; *see also De Grandy*, 512 U.S. at 1027 (Kennedy, J., concurring) ("The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter.").

To argue otherwise, the Secretary relies on nonbinding and inapposite out-of-circuit cases. Br. 27. In *LULAC Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993), for example, while the Fifth Circuit decided that Section 2 plaintiffs ought not succeed where "the record indisputably proves that partisan affiliation, not race best explains the divergent voting patterns among minority and white citizens," 999 F.2d at 850, it recognized considerable problems with any approach that would require plaintiffs to prove "that a minority group's failure to elect representatives of

its choice is caused by racial animus in the white electorate." *Id.* at 859–60. For example, it noted that the statistical analysis necessary to disentangle voter motivations would be difficult and expensive, and adding to plaintiffs' evidentiary burden "would facilitate the use of thinly-veiled proxies by permitting, for example, evidence that a minority candidate was regarded as 'unqualified' or 'corrupt' to defeat a claim that white voters' refusal to support him was based on race or ethnicity." *Id.* at 860. And the court recognized that "partisan affiliation may serve as a proxy for illegitimate racial considerations." *Id.* Ultimately, the court determined that it "need not resolve the debate" over plaintiffs' evidentiary burden at all because, in that case, the defendants had parried plaintiffs' claims with evidence of nonracial causes of voting preferences in the particular areas of Texas at issue. *Id.* at 850, 860.

Even *Clements*'s qualified endorsement of any effort to disentangle race from politics as a part of the *Gingles* preconditions remains the exception, not the rule. *See United States v. Charleston County*, 365 F.3d 341, 347–48 (4th Cir. 2004) ("[T]he approach most faithful to the Supreme Court's case law 'is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions, but relevant in the totality of circumstances inquiry.") (quoting *Lewis*, 99 F.3d at 615–16 n.12); *Sanchez*, 97 F.3d at 1319 (distinguishing *Clements* as operating "in a special context in which the courts have weighed the linkage of the judicial and

35

jurisdictional districts a state draws as an important factor in the totality of circumstances" and  premised "on the fact that plaintiffs made no effort to establish racial bloc voting in the first instance, relying instead on what they believed was the uncontrovertible evidence of minority failure at the polls").[8]

The Secretary's other cases fare no better. *See Uno v. City of Holyoke*, 72 F.3d 973, 981–83 (1st Cir. 1995) (maintaining that evidence of racial bias is relevant to the totality of circumstances and explaining that "this framework imposes a high hurdle for those who seek to defend the existing system despite meaningful statistical evidence that suggests bloc voting along racial lines"); *Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999) ("We therefore ratify the approach taken by the district court to consider the political partisanship argument under the 'totality of circumstances' analysis rather than as part of the third *Gingles* precondition.); *Clarke v. City of Cincinnati*, 40 F.3d 807, 813 n.2 (6th Cir. 1994) ("[W]e need not consider whether a showing that the minority-preferred candidates' lack of success is 'somehow tied to race' is a prerequisite to a finding of legally significant white bloc voting." (cleaned up)). In the end, the case law is clear: while the cause of polarization may at times be relevant to the totality-of-circumstances inquiry, it is in no way dispositive. The district court thus did not err in finding that

---

[8] Even within the Fifth Circuit, *Clements* represents "the unusual case" in which the *Gingles* factors are established but plaintiffs failed to establish a Section 2 violation. *See Lopez v. Abbott*, 339 F. Supp. 3d 589, 602–04 (S.D. Tex. 2018).

the second and third *Gingles* inquiries are objective and require no showing of the content of white voters' hearts and minds when they enter the polling booth.

### B. Appellees proved vote dilution based on racial bloc voting.

Even if Appellees had to prove that race explains polarization in Georgia, they have done so here. *See* Br. 29. The district court found extremely strong evidence of racially polarized voting. Doc. 286 at 236. And the district court credited witness testimony documenting the strong connection between race and party preference in Georgia. *Id.* For example, Dr. Palmer testified that race and party cannot be separated for the purposes of his racial polarization analysis. Tr. 424:5–8. Dr. Burton testified that the partisan alignment of Black and white voters in Georgia is due in part to historical positions those two parties have taken on issues related to race, such as civil rights legislation. Tr. 1445:1–1448:18. He also made clear that the parties' positions on race-related issues continues to inform partisan alignment today. Tr. 1460:8–21. And Dr. Burton provided evidence of "a meaningful difference in Black candidate success depending on the percentage of white voters in a district." Doc. 286 at 239.

The Secretary, on the other hand, failed to introduce *any* evidence that partisanship rather than race drove the voting patterns of Black and white Georgians. The Secretary's expert, Dr. Alford, testified only that "scientific causation in the social sciences is very difficult to establish" and did not offer an opinion as to the

cause of Black Georgians' voting behavior. Tr. 2226:2–2227:1. He conceded that the data indicate that the race of the voter "influences voting behavior," *id.* 2253:12–16, "agree[d]" that Black and white voters in Georgia "are voting in very different ways," 2255:25–2256:1; *see also id.* 2252:6–11 (agreeing that "racially polarized voting" is defined as "clear cohesion on the minority group, typically in support of minority candidates, and a clear cohesion in the opposite direction, or bloc voting on behalf of the majority, that is, by white voters"); and admitted that he did not even examine—let alone dispute—Dr. Burton's testimony regarding the extent to which "race has informed party affiliation in Georgia," *see id.* 2252:23–2254:6.

On appeal, the Secretary focuses myopically on the fact that the race of candidates does not explain voting patterns of Black and white voters. Br. 32–33. But candidates' race is not dispositive for the polarization inquiry. *See De Grandy*, 512 U.S. at 1027 (Kennedy, J., concurring). Thus, substantial evidence supported the district court's finding that Appellees presented evidence that racial considerations motivate the clear and stark pattern of polarization between white and Black Georgians. Doc. 286 at 238.

## II.    The district court did not clearly err in finding that Georgia's political system is not equally open to Black voters.

Having satisfied the *Gingles* prerequisites, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles*

[preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). This is not an unusual case.

The district court determined that Appellees successfully established that Senate Factors 1, 2, 3, 5, and 7 weigh in favor of showing the present realities of a lack of opportunity for Black voters. Doc. 286 at 481. In doing so, the Court credited Appellees' experts Dr. Burton and Dr. Collingwood, gave their evidence great weight, and noted the dearth of any counterevidence from the Secretary.

The Secretary faults the court for analyzing Senate Factors 1 and 3 together, but courts often consider multiple Senate factors together given the significant overlap in trial evidence. *See, e.g.*, *Singleton*, 582 F. Supp. 3d at 1020 (considering Senate factors 1, 3, and 5 together). Moreover, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45.

The Secretary also takes issue with the Court's consideration of official practices that have a disproportionate impact in the Senate factor 1 inquiry, Br. 36, but cites no authority to support the proposition that "official discrimination" requires a judicial finding of intent or racial animus to satisfy the first Senate factor. Rather, official discrimination encompasses all state actions that have a

discriminatory effect. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 & n.14 (1977) (distinguishing between official racial discrimination, which encompasses state action that "bears more heavily on one race than another," and invidious discrimination, which requires intent or purpose).

As to the other factual determinations relevant to the first and third Senate factors, the district court gave appropriate weight to present day voting practices that disproportionately impact Black Georgians, including polling place closures, voter purges, and implementation of the voter registration identity verification requirement. Doc. 286 at 219–27. In analyzing a recent election bill's disparate impact on Black Georgians, the district court was careful in distinguishing discriminatory impact from discriminatory intent. *Id.* at 227–30. While the Secretary highlights examples of voting practices the court found to support Senate factor 3 as (in his opinion) "isolated incidents," Br. 37–38, none were dispositive to the district court's thorough totality analysis.

In the end, the Secretary does not meaningfully challenge the district court's findings at the totality-of-circumstances stage. The Secretary rehashes causation arguments relating to racially polarized voting, which, for the reasons explained above, *supra* Section I.A., are without merit. The Secretary misleads the Court by trying to redefine Georgia's majority as all non-Black voters, Br. 39, but there is no dispute that the "majority group" in Georgia is the white population, and so the court

40

must ascertain if "whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56.[9] And the Secretary did not and does not dispute the evidence that Black candidates, with minimal exceptions, can win in Georgia only if they are elected from a majority-Black district. *See supra* 7–16 (fact section).

Finally, the Secretary twists the evidence, which shows that Georgia's white majority is *overrepresented* in elected offices, to argue that proportionality weighs against a Section 2 violation finding. Br. 42. But proportionality "asks whether 'minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting age population,'" *Wright*, 979 F.3d at 1289 (quoting *De Grandy*, 512 U.S. at 1000), not whether the number of successful minority candidates is proportional to the minority population. Here, at most, only four of Georgia's 2021 enacted congressional districts—less than 29% of the total—have Black voting-age populations that exceed 50%. Only 25% of Senate districts are majority-Black, and only 27.2% of the House districts are

---

[9] The Secretary's citation to *LULAC* is misleading. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006). There, the appellants argued that the Black population could elect their candidate of choice because "a significant number of Anglos and Latinos" voted for their preferred candidate of choice. *Id.* at 444. The Court never stated that white and Latino voters were the "majority" for the purposes of the *Gingles* analysis. Instead, it was focused on crossover voting, which is wholly inapplicable here.

majority-Black. The district court did not err in finding that proportionality did not weigh in favor of either party in this case. Doc. 286 at 262–70.

In sum, there is "no reason to disturb the District Court's careful factual findings, which are subject to clear error review," *Allen*, 599 U.S. at 23, especially in light of the "considerable deference" given to the district court's findings, *Johnson*, 296 F.3d at 1074.

## III.  Section 2 is constitutional.

Unable to contest the straightforward application of *Gingles* factors to the substantial evidence of vote dilution in the record, the Secretary attempts to heighten the standard for assessing Section 2's constitutional validity of Section 2 and impose a novel temporal limitation on its protections. These arguments are not persuasive.

### A.  Section 2 falls well within Congress's authority to enforce the Fifteenth Amendment.

The Secretary argues that Section 2 is neither congruent nor proportional to the harm it seeks to redress because it requires remedial race-based redistricting that is not justified by a congressional record reflecting contemporary evidence of racial discrimination. Br. 44–51. This argument misses twice-over by misapplying the wrong standard. First, the "congruence and proportionality" test that the Secretary urges is applicable to legislation enacted pursuant to Congress's authority to enforce the *Fourteenth Amendment*. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Congress's enforcement of the *Fifteenth Amendment*, on the other hand—including

42

through Section 2 of the Voting Rights Act—need only be a "rational means [of] effectuat[ing]" the Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *see Shelby County*, 570 U.S. at 550–51; *City of Rome v. United States*, 446 U.S. 156, 177 (1980). As the Secretary acknowledges, the Supreme Court reaffirmed that Section 2 survives this undemanding test just last term in *Allen v. Milligan*. *See* Br. 47.

*Allen* completely forecloses the Secretary's constitutional argument. There, Alabama relied on the same cases the Secretary cites here, *City of Boerne* and *Katzenbach*, to argue that Section 2's race-based redistricting remedy was "unmoored from the Fifteenth Amendment's prohibition on intentional discrimination." Appellants' Br. 74, *Allen v. Milligan*, Nos. 21-1086 & 21-1087 (Apr. 25, 2022). Alabama urged the Court to apply the "congruence and proportional" standard applied in *City of Boerne*, *id.*, but the Court passed on the invitation.

In any event, Section 2 satisfies constitutional review under any standard. The Supreme Court explicitly rejected Alabama's argument, echoed here, that "the Fifteenth Amendment . . . does not authorize race-based redistricting as a remedy for § 2 violations," and the high court made clear that it was "not persuaded . . . that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Allen*, 599 U.S. at 41. The Secretary attempts to limit this clear holding to dicta about

43

Congress's remedial authority in 1965, but if Section 2 was constitutional in 2023, *see id.* (holding as much), then it undoubtedly remains constitutional in 2024.

**B.    Section 2 continues to be a constitutional means of enforcing the Fifteenth Amendment.**

Relying on *Shelby County v. Holder*, the Secretary argues that Section 2 is no longer justified because the evidence that Congress considered in enacting the statute is decades old. Br. 49–51. But *Shelby County* cannot stand for the proposition that every statute becomes invalid unless Congress has recently reenacted or amended it with fresh findings. *See id.* at 50. If that were the case, monopolists would be free to ignore the venerable Sherman Antitrust Act of 1890, and mobsters facing federal charges could complain that the statutes criminalizing their conduct were legislated too long ago. That is plainly not how the law works. When Congress exercises its constitutional authority to proscribe conduct that it deems harmful—as *Allen* confirmed Congress did in enacting Section 2—that conduct remains unlawful until the political process produces a contrary policy judgment through amendment or repeal.

*Shelby County*'s caveat to this elementary principle reflected a highly unusual (perhaps even unique) circumstance. The statutory provision at issue there was several steps removed from proscribing harmful conduct—the Court reviewed a coverage formula that singled out particular jurisdictions, based on historical data, that had to obtain federal permission before enacting any law related to voting. *See*

44

*Shelby County*, 570 U.S. at 534–35. This regime required states that may have done nothing wrong for decades to obtain preclearance before enacting new laws, "however innocuous," that would be valid in any other state. *Id.* at 544. Congress could single out jurisdictions for such strong medicine, the Court held, only where the prescription was justified by present-day symptoms of discrimination and disenfranchisement. *Id.* at 535, 553.

Section 2 is different in every way—as *Shelby County* itself recognized. *Id.* at 537. Where the coverage formula at issue in *Shelby County* discriminated against disfavored states, Section 2's commands apply "nationwide," *id.*, in equal force from Georgia to Oregon, from Atlanta to Albuquerque. Where the coverage formula subjected states to preclearance "based on decades-old data and eradicated practices . . . having no logical relation to the present day," *id.* at 551, 554, Section 2 applies only upon "a searching practical evaluation of the past and present reality" and "intensely local appraisal," *Gingles*, 478 U.S. at 79 (cleaned up), and the statute's application will naturally fall into desuetude "as segregation decreases—as it has 'sharply' done since the 1970s," *Allen*, 599 U.S. at 28–29. Where the coverage formula required states to proactively beseech federal officials, hat in hand, for permission to enact voting regulations, Section 2 guarantees victims of discrimination a remedy for violations that have been proven in court. In short,

nothing about Section 2's routine scheme is "extraordinary," "drastic," "unprecedented," or in any way unconstitutional. 570 U.S. at 534–35.[10]

Affirmative action decisions are similarly far afield. *Contra* Br. 55–57 (citing *SFFA*, 600 U.S. 181 (2023), and *Grutter v. Bollinger*, 539 U.S. 306 (2003)). *SFFA*'s only reference to redistricting is in a citation provided to support the principle that "race-based government action" is *permitted* to "remediat[e] specific, identified instances of past discrimination that violated the Constitution or a statute." 600 U.S. at 207 (citing *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996)). Remedial maps enacted to comply with Section 2 fall squarely within this authorization.

University admissions, as the Supreme Court explained, are altogether different. In *SFFA*, the Court rejected the interests that universities offered in defense of race-conscious admissions programs as "not sufficiently coherent for purposes of strict scrutiny." *Id.* at 214. And it emphasized the universities' concession that there was no conceivable circumstance whereby their system of racial preferences would no longer be necessary. *Id.* at 221

---

[10] Neither *Greater Birmingham Ministries v. Secretary of State for Alabama*, 992 F.3d 1299 (2021), nor *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), supports the proposition that Congress must adduce contemporary evidence to sustain the constitutionality of legislation it has previously enacted. *Contra* Br. 49–50. Both cases merely state that evidence contemporary to a bill's passage is probative of legislative intent. *See Greater Birmingham Ministries*, 992 F.3d at 1321–22; *Veasey*, 830 F.3d at 232.

25. In contrast, the Supreme Court has found interests in remedying unlawful vote dilution to be concrete and compelling. *See Allen*, 599 U.S. at 41 ("[W]e are not persuaded by Alabama's arguments that [Section] 2 as interpreted in *Gingles* exceeds the remedial authority of Congress."). And Section 2's functional expiration date for vote-dilution claims, *Allen* explains, is built directly into the *Gingles* examination of present-day segregation and polarization, *id.* at 28–29, which is subject to objective mathematical measurement.[11]

## C.    The district court did not clearly err in finding that Georgia's politics were not equally open to Black and white Georgians.

The Secretary's argument that race-conscious remedial redistricting is no longer needed in Georgia, *see* Br. 52–54, is untethered to any legal doctrine and belied by the substantial, contemporary evidence in the record. Again relying almost exclusively on *Shelby County*, the Secretary asks the Court to invalidate Section 2 because "things have changed dramatically" since Section 2 was amended, *see id.* at 52 (quoting *Shelby County*, 570 U.S. at 547). But as explained above, nothing in

---

[11] The Secretary also quotes *National Association of the Deaf v. Florida*, 980 F.3d 763, 771 (11th Cir. 2020), for the proposition that Section 2 is not an "'appropriate response'" to race-based redistricting. Br. 56–57. But the Court in that case analyzed whether the Americans with Disabilities Act's ("ADA") abrogation of sovereign immunity was "congruent and proportional" to Congress's Fourteenth Amendment power. *See* 980 F.3d at 771. This appeal does not implicate the ADA, sovereign immunity, or the Fourteenth Amendment. *See supra* at 37–38 (explaining that "congruent and proportional" analysis is inapplicable to statute enacted pursuant to the Fifteenth Amendment).

*Shelby County* suggests that Section 2 is unconstitutional. To the contrary, it made clear that "Section 2 is permanent, applies nationwide, and [wa]s not at issue in th[at] case." 570 U.S. at 537.

In any event, the record contains substantial, contemporary evidence that Georgia's political system is not equally open to Black voters. Black Georgians participate in the political process at substantially lower rates than white Georgians. Doc. 174-6 at 3. Black Georgians vote at significantly lower rates than white Georgians, and this is true at statewide, county, and precinct levels—including in Metro Atlanta. *Id.* at 3, 7–19. Black Georgians are less likely to attend political meetings, display political signs, contact public officials, and donate money to political campaigns. *Id.* at 34–38. The socioeconomic disparities between Black Georgians and non-Hispanic white Georgians are a cause of lower political participation rates by Black Georgians. *Id.* at 7, 24–33. As Dr. Collingwood explained, there is extensive literature in political science demonstrating a strong and consistent link between socioeconomic status and voter turnout. *Id.* at 7. For example, studies have shown that wealth and education drive donation behavior, campaign volunteering, and voting. *Id*. "Where [socioeconomic disparities] are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." *Wright*, 979 F.3d at 1294 (cleaned up).

Black officials have been underrepresented across Georgia's statewide offices as well. Georgia has had 77 governors, none of whom has been Black. Doc. No. 231 Attach. E ¶ 349. Only three Black people have been elected to non-judicial statewide office in Georgia's history: Labor Commissioner Mike Thurmond, Public Service Commissioner David Burgess, and Attorney General Thurbert Baker. Tr. 1202:1–8. The Black Georgians who have been elected in recent years have almost always been elected from majority-minority districts. In the 2020 General Assembly elections, for example, none of the House's Black members were elected from a district where white voters exceeded 55% of the voting-age population, and none of the State Senate's Black members were elected from a district where white voters exceeded 47% of the voting-age population. Doc. 286 at 238–40. Although Black Georgians comprise more than 33% of the state's population, the Georgia Legislative Black Caucus has only 14 members in the Georgia State Senate—25% of that chamber— and 41 members in the Georgia House of Representatives—less than 23% of that chamber. Doc. No. 231 Attach. E ¶ 348; Tr. 1201:21–25. Under the 2021 congressional plan, nine of Georgia's 14 congressional districts (or 64.29%) are majority-white under any metric, despite the fact that white Georgians comprise a bare majority of the statewide population. The addition of a majority-Black district still yields a map that retains eight out of 14 (57.14%) majority-white districts, a

49

proportion that is greater than white Georgians' share of the state's total population, voting-age population, and citizen voting-age population.

Thus, even if the Secretary takes issue with some of the evidence the district court considered in ruling that Georgia's system is not equally open to Black voters, the substantial evidence in the record supporting the district court's finding confirms that it is not clearly erroneous. *Cf. Wright*, 979 F.3d at 1301 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quotation marks omitted)). And the clearly erroneous standard requires this Court to defer to the district court's "finding that different pieces of evidence" of vote dilution "carry" more significant "probative values" than the Secretary would choose to afford them. *See id.*

Though the Secretary also takes issue with the absence of any findings that Georgia continues to intentionally discriminate against its Black citizens or engage in racial gerrymandering, the district court had no need to make such findings because intentional discrimination is not, as the Secretary contends, "the wrong that race-based redistricting under § 2 purports to deter." *See* Br. 54. "Under § 2 . . . the injury is vote dilution." *LULAC*, 548 U.S. at 433. Thus, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. Despite the

50

progress that Georgia has made since the Voting Rights Act was enacted in 1965, this substantial record evidence confirms that the district court did not err in ruling that Georgia's system is not equally open to Black voters today.

## IV.  The district court correctly ruled that Section 2 provides a private right of action.

The Secretary next argues that Section 2 provides no private right of action, but this Court, the Supreme Court, and countless other courts over the last 40 years have repeatedly concluded otherwise, both explicitly and by entertaining scores of Section 2 cases brought by private plaintiffs. In any event, application of the *Sandoval* test and statutory stare decisis compel the conclusion that Congress created a private right of action to enforce Section 2.

### A.  The Supreme Court has interpreted the Voting Rights Act to permit private parties to sue under Section 2.

Although the Supreme Court has not directly decided the question Georgia raises here, "it has decided a close cousin of [the] question, and that precedent strongly suggests that Section Two provides a private right of action." *Singleton*, 582 F. Supp. 3d at 1031. In *Morse*, the Supreme Court explained on the way to holding that Section 10 of the VRA provides a private cause of action that:

> Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30. We, in turn, have entertained cases brought by private litigants to enforce § 2. It would be anomalous, to say the least, to hold that both § 2 and § 5

are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

517 U.S. at 232 (cleaned up). That Section 2 provides a private cause of action was essential to the Court's holding regarding Section 10, and the decision in *Morse* was supported by five justices who concurred in its reasoning and judgment. *Id.*

*Morse*'s holding with respect to Section 2 cannot simply be waved away as dicta. *Morse*'s discussion of Section 2 presents a "well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). *Morse*'s reasoning spans dozens of pages and is comprised of careful examination of the VRA's text, relevant legislative history, and the Court's prior precedent. *See Morse*, 517 U.S. at 230–31. It is a model opinion precisely of the sort this Court described in *Schwab*. 451 F.3d at 1325.

In *Alabama State Conference of the NAACP v. Alabama*, this Court applied *Morse*'s reasoning, alongside the Supreme Court's prior cases considering Section 2 claims brought by private litigants, to hold that Section 2 provided a right of action. 949 F.3d 647, 653 (11th Cir. 2020), *vacated as moot* 141 S. Ct. 2618 (2021) (mem.). Although *Alabama State Conference of the NAACP* was subsequently vacated on

52

grounds unrelated to its holding that Section 2 provides a private right of action, this Court remains "free to give statements in a vacated opinion persuasive value if [it] think[s] they deserve it," *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009), and it should choose to do so based on *Alabama State Conference of the NAACP*'s well-reasoned application of *Morse*, *see generally Ford v. Strange*, 580 Fed. App'x 701, 705 n.6 (11th Cir. 2014) ("A majority of the Supreme Court has indicated that Section 2 of the [VRA] contains an implied private right of action.").

Dozens of other courts (within and without the Eleventh Circuit) over dozens of years have agreed that Section 2 provides a private right of action. *See, e.g.*, *Robinson v. Ardoin*, 86 F.4th 574, 587–88 (5th Cir. 2023); *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999); *Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-CV-05338, 2023 WL 7093025, at *6–8 (N.D. Ga. Oct. 26, 2023) (three-judge court); *see also, e.g.*, *Coca v. City of Dodge City*, 669 F. Supp. 3d 1131, 1140 (D. Kan. 2023); *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1079 n.12 (W.D. Ark. 2022) (holding that the "Supreme Court has long found—consistent with § 3 and the VRA's remedial purpose—that a right of action exists for private parties to enforce the VRA's various sections"); *Mich. Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 105 (D.D.C. 2022) (noting the Supreme Court "recognized a private right of action under § 2" in *Morse*); *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014)

(same); *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) (same).

**B.    Application of the *Sandoval* test compels the conclusion that Congress created a private right of action to enforce Section 2.**

Even if the Supreme Court had not interpreted the Voting Rights Act to permit private parties to sue under Section 2, an independent analysis confirms that it does. Under the Supreme Court's prevailing test, a statute creates an implied cause of action when it (1) contains "rights-creating" language and (2) provides for "a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286–88 (2001). Both elements are satisfied here.

Under the *Sandoval* test, a statute contains "rights-creating" language where its terms are "phrased in terms of the persons benefited." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quotation marks omitted). With its focus on a citizen's right to equal participation in the country's electoral processes, Section 2 plainly contains "rights-creating" language. The provision protects the "right of any citizen . . . to vote" free from discrimination. 52 U.S.C. § 10301(a). Section 2's terms therefore are expressed through a focus on "the persons benefited," not the individuals or entities to be restrained. *Gonzaga*, 536 U.S. at 284. As the Supreme Court has explained, Section 2 creates a "right to an undiluted vote" that belongs to a minority group's "individual members." *LULAC*, 548 U.S. at 437 (quoting *Shaw*, 517 U.S. at 917).

54

Section 2's language closely mirrors language the Supreme Court has previously found to be "rights-creating." In *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023), for example, the Court held that a statute referencing the "rights" of nursing home "residents" contained necessary rights-creating language. *Id.* at 184. In *Sandoval*, the Court declined to find a private cause of action in Section 602 of Title VI because its text was *solely* focused on the regulating entity rather than "the individuals protected" by the statute. 532 U.S. at 289. Section 602 stood in contrast to Section 601, the Court explained, which the Court found *does* create a private action based on its language that "[n]o person [shall] be subjected to discrimination." *Id.* at 288–89. Section 2's text, which protects the "right of any citizen . . . to vote," is of a piece.

Moreover, Section 2 is accompanied by a private remedy. Section 3 of the VRA expressly provides relief to "the Attorney General *or an aggrieved person*" upon a successful suit brought "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. §10302(a) (emphasis added). There is no doubt that Section 2 is a statute meant to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments. *See Allen*, 599 U.S. at 10–14. And there is no doubt that by "Attorney General or an aggrieved person" Congress intended "to provide the same remedies to private parties as had formerly been available to the Attorney General alone." *Morse*, 517 U.S. at 233. Together, these two clauses

55

lead to but one conclusion: that Congress provided private litigants a remedy under Section 2. *See Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338, 2022 WL 18780945, at *6 (N.D. Ga. Sept. 26, 2022).

Section 12 and 14(e) of the VRA also provide private Section 2 litigants with a remedy. First, Section 14(e) permits "the prevailing party, *other than the United States*" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10310(e) (emphasis added). "Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees." *Morse*, 517 U.S. at 234. This textual reading of Section 14 is supported by the provision's legislative history, as the Senate reported when amending the VRA in 1975. *See supra* Section I.A.; S. Rep. 94-295, 40, 1975 U.S.C.C.A.N. 774, 807 (1975); *see also Shelby County v. Holder*, 43 F. Supp. 3d 47, 67 (D.D.C. 2014) (explaining Section 14 aims to "encourage private attorneys general to bring lawsuits vindicating individual voting rights") (collecting cases); *Shelby County v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the VRA . . . when prevailing parties helped secure compliance with the statute").

Section 12(f), moreover, provides that "district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether *a person asserting rights* under the

provisions of chapters 103 to 107 of [the VRA] shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10308(f). The provision's reference to "a person" plainly contemplates suits brought by individuals other than the Attorney General. And the administrative exhaustion defenses eliminated by Section 12(f) were formerly barriers to private litigants, not the Attorney General. *Cf. Vote.org v. Callanen*, 89 F.4th 459, 476–77 (5th Cir. 2023) (discussing similar VRA provision); *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003).

Against the force of the VRA's text and history, the Secretary musters little. The Secretary argues that because "Congress vested enforcement power in the Attorney General," it did not intend to create a private remedy. Br. 59–61. But the existence of one enforcement mechanism does not alone defeat the existence of others. Indeed, Title IX contains an "express enforcement mechanism," *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009), which constitutes an "express provision of one method of enforcing a substantive rule," *Sandoval*, 532 U.S. at 290, and yet the Supreme Court has held that Title IX contains an implied private right of action. *See id.* at 280; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). Indeed, this Court has already held that a "district court erred by finding that Congress's provision for enforcement by the Attorney General in" the Civil Rights Act "precluded continued enforcement of [the CRA] by a private right of

57

action under § 1983." *Schwier*, 340 F.3d at 1295–96. Thus, although Section 2 may be enforced by the Attorney General, that alone does not and cannot defeat the many ways, as explained above, in which Congress authorized private parties to enforce the VRA.

The Secretary's citation to *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985), which found no private remedy against ERISA fiduciaries, is inapposite. There, the "enforcement scheme crafted with . . . evident care" that the Court was "reluctant to tamper with" consisted of "six carefully integrated civil enforcement provisions," that, taken together, formed an "'interlocking, interrelated, and interdependent remedial scheme.'" 473 U.S. at 146–47 (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361 (1980)). Indeed, ERISA provided the plaintiff with "a panoply of remedial devices" that would have allowed her to recover denied benefits by, for example, "fil[ing] an action . . . to recover accrued benefits," obtain declaratory or injunctive relief, or "ask[ing] for the removal of the fiduciary. *Id.* ERISA's "interlocking, interrelated, and interdependent remedial scheme," *Id.* at 146 (quotations marks omitted), bears no resemblance to the VRA's comparatively limited scheme of public enforcement.

The Secretary also argues that Section 3's "aggrieved person" language does no more than recognize the existence of "private causes of action that already existed when that term was added to the statute in 1975," "suits under § 5, or any other

58

causes of action that the Court might recognize in the future." Br. 63 (quotation marks omitted). But Section 3 makes none of those distinctions, and the Secretary's strained reading—and his concession that it could provide a means to recognize any cause of action that the Court might recognize in the future—only underscores that the provision's most natural reading encompasses "*any* statute to enforce the voting guarantees of the fourteenth or fifteenth amendment[s]," without limitation. 52 U.S.C. § 10302(a) (emphasis added).

### C. Statutory stare decisis also weighs in favor of finding a private right of action exists.

The Secretary's invitation for the Court to read the private right of action out of Section 2 cannot overcome the "special force" of statutory stare decisis. *See Halliburton Co v. Erica P. John Fund*, 573 U.S. 258, 274 (2014). Where, as here, Congress "acquiesce[s]" to the Supreme Court's interpretation of a statute, *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008), its inaction "enhance[s] even the usual precedential force" of the Court's decisions, *Shepard v. United States*, 544 U.S. 13, 23 (2005); *see also Kimble*, 576 U.S. at 456 (explaining judicial interpretation of a statute is a "ball[] tossed into Congress's court, for acceptance or not as that branch elects").

For decades, the federal courts have accepted hundreds of Section 2 cases brought by private litigants. *See, e.g.*, *Allen*, 599 U.S. at 17–18, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 (2021) ("In the years since *Gingles*,

we have heard a steady stream of [Section 2] vote dilution cases."); *Perry v. Perez*, 565 U.S. 388, 391 (2012); *LULAC*, 548 U.S. at 409; *Chisom*, 501 U.S. at 383–84; *Hous. Laws.' Assoc. v. Att'y Gen. of Tex.*, 501 U.S. 419, 421–22 (1991); *Gingles*, 478 U.S. at 35; *City of Mobile v. Bolden*, 446 U.S. 55, 58–59 (1980). "Congress is undoubtedly aware" of the Supreme Court construing Section 2 to contain a private right of action and "can change that if it likes." *Allen*, 599 U.S. at 39. Indeed, the Senate Report accompanying the 1975 amendment to the statute expressly stated that "Congress depends heavily upon private citizens to enforce the fundamental rights involved." S. Rep. 94-295, 40, 1975 U.S.C.C.A.N. 774, 807 (1975). And yet Congress has found no reason to correct the judiciary's interpretation of Section 2, despite passing amendments to the VRA in 1975, 1982, 1992, and 2006. This "long congressional acquiescence [enhances] even the usual precedential force [that courts] accord to [their] interpretations of statutes." *Watson v. United States*, 552 U.S. 74, 82–83 (2007) (quotation marks omitted). Because "Congress has spurned multiple opportunities to reverse" the federal judiciary's long-standing interpretation of Section 2, the Secretary must supply a "superspecial justification" to change course. *Kimble*, 576 U.S. at 456, 458. He does not and cannot do so.

## CONCLUSION

For the foregoing reasons, the district court's ruling should be affirmed.

Dated: April 8, 2024

Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
(404) 888-9700
JLewis@khlawfirm.com
Sparks@khlawfirm.com

Respectfully submitted,

By *Abha Khanna*
Abha Khanna
Makeba Rutahindurwa
ELIAS LAW GROUP LLP
1700 Seventh Ave.,
Suite 2100
Seattle, WA 98101
(206) 656-0177
AKhanna@elias.law
MRutahindurwa@elias.law

Michael B. Jones
Georgia Bar No. 721264
ELIAS LAW GROUP LLP
250 Mass. Ave. NW,
Suite 400
Washington, DC 20001
(202) 968-4490
MJones@elias.law

*Counsel for Plaintiffs-Appellees in Nos. 23-13916 & 23-13921*

61

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2), as it contains 12,864 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: April 8, 2024

*Abha Khanna*
*Counsel for Plaintiffs-Appellees in*
*Nos. 23-13916 & 23-13921*

62

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that, on April 8, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: April 8, 2024

*Abha Khanna*

*Counsel for Plaintiffs-Appellees in Nos. 23-13916 & 23-13921*